06 CV 6168

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SUE PINCUS, derivatively on behalf of BP p.l.c., )
)
Plaintiff, )
)
vs. )
)
JOHN BROWNE, BYRON E. GROTE, DAVID C. )
ALLEN, IAIN C. CONN, TONY A.B. )
HAYWARD, JOHN A. MANZONI, PETER D. )
SUTHERLAND, IAN PROSSER, JOHN H. )
BRYAN, ANTONY BURGMANS, ERROLL B. )
DAVIS, JR., DOUGLAS J. FLINT, DEANNE S. )
JULIUS, TOM MCKILLOP, and WALTER E. )
MASSEY, )
)
Defendants, )
)
-and- )
)
BP p.l.c., )
)
Nominal Defendant. )
)
)

---

**VERIFIED SHAREHOLDER**
**DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

AUG 1 4 2006

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, by and through her attorneys, alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a shareholder derivative action brought on behalf and in the name of BP

p.l.c. ("BP" or the "Company") to remedy the severe harm caused to the Company by its senior

officers' and directors' mismanagement and neglect.  Specifically, in breach of their fiduciary

duties and their own code of corporate governance, the defendants allowed one of BP's prized

assets, the oil transit pipeline system serving the Prudhoe Bay, Alaska oil field -- the largest in

America, representing 8% of national output -- to decay to the point that the Eastern half of the

field accounting for almost three-quarters of the entire field's output is, at this time, not operational.

2.      Defendants became aware of the problem of corrosion in the pipeline years ago, but took no substantial steps to remedy the situation. In March 2006, the effect of defendants' neglect began to tell when the pipeline leaked 6,400 barrels of crude, the largest spill in the field's history. Still, Defendants took no substantial steps to remedy the situation. As a result, on August 7, 2006, the Company was forced to shut down Prudhoe Bay's operation when a second leak in the pipeline was discovered.

3.      Despite their awareness of the dangerous effect of the corrosion in the pipeline, defendants repeatedly failed to fund the work necessary to correct the problem, opting instead to squeeze out every last penny in current profits -- $7.3 billion last quarter -- at the expense of properly and safely maintaining the pipeline and the Company's future profitability. BP now faces hundreds of millions of dollars in costs to remedy the damage, lost earnings, significant civil and criminal liability, regulatory scrutiny and action and the wrath of customers nationwide who are facing ever higher gasoline prices at the pump.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States. This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, the

Company maintains offices and conducts substantial business in this District including the
oversight of the Company's American operations.

## THE PARTIES

5.      Plaintiff holds shares of BP and held those shares at the time of the wrongful
conduct enumerated herein.

6.      Nominal Defendant BP is a public limited company registered in England and
Wales. The Company was created in 1998 as a result of the merger of Amoco Corporation and
the British Petroleum Company p.l.c. BP maintains three operating business segments:
Exploration and Production; Refining and Marketing; and Gas, Power and Renewables.
Approximately 40% of the Company's fixed assets are located in the U.S.A. BP has a strong
refining and marketing presence in the U.S.A.; marketing under the Amoco and BP brands in the
Midwest, East, and Southeast, and under the Arco brand on the West Coast. The Company is
also involved in power projects in the U.S.A. For the years ended December 31, 2003, 2004, and
2005, the U.S.A. accounted for the single largest source of the Company's sales and operating
revenues categorized by geographical area. Within its Exploration and Production operating
business segment, the company performs upstream activities (oil and natural gas exploration and
field development and production) and midstream activities (management of crude oil and
natural gas processing facilities). According to the Company's public filings with the SEC, the
Trans Alaska Pipeline System is first among its "most significant midstream pipeline interests."
More importantly, in terms of its upstream activities, including oil production, the Company lists
the fields of Prudhoe Bay as its most productive field for per day net production. The U.S.A.

3

also represents the Company's single largest concentration of employees worldwide reported by geographical area.

      7.      BP is governed by a Board of Directors, currently composed of nine Non-Executive Directors, including the Chairman, and six Executive Directors.  The Chairman and Non-Executive Directors of BP are elected each year and, subject to BP's Articles of Association, serve on the basis of letters of appointment.  Executive Directors of BP have service contracts with the company.  In its Form 20-F, BP states that:

> Governance is not an exercise in compliance nor is it a higher form of management.  Governance is a more powerful concept.  It has a clear objective: ensuring the pursuit of the Company's purpose.  The board's activity is focused on this task, which is unique to it as the representative of BP's owners.  This task is discharged by the board through undertaking such activities as are necessary for the effective promotion of long-term shareholder interest.  In promoting the long-term interest of shareholders, the board has to ensure that the business is responsive to the views of those with whom it comes into contact.  This can include gaining an understanding of the environmental and social consequences of the Company's actions.  However, it remains a matter of business judgement as to how these consequences are properly taken into account in maximizing shareholder value.

> Governance is the system by which the Company's owners and their representatives on the board ensure that it pursues, does not deviate from and only allocates resources to its defined purpose.

> As a Company, we recognize the importance of good governance and that it is a discrete task from management.  Clarity of roles is key to our approach.  Policies and processes depend on the people who operate them.  Governance requires distinct skills and processes.  Governance is overseen by the BP board, while management is delegated to the group chief executive by means of the board governance policies.

> Our board governance policies use a coherent, principles-based approach, which anticipated many developments in UK governance regulation.  These policies ensure that our board and management operate within a clear and efficient governance framework that places long-term shareholder interest at the heart of all we do.

To that end, our board exercises judgement in carrying out its work in policy-making, in monitoring executive action and in its active consideration of Group strategy. The board's judgements seek to maximize the expected value of shareholders' interest in the Company, rather than eliminate the possibility of any adverse outcomes.

\* \* \*

Our board is accountable to shareholders for the performance and activities of the entire BP Group. It embeds shareholder interest in the goals established for the Company.

\* \* \*

The efficiency and effectiveness of the board are of paramount importance. Our board is large but this is necessary to allow sufficient executive director representation to cover the breadth of the Group's business activities and sufficient non-executive representation to reflect the scale and complexity of BP and to staff our board committees. A board of this size allows orderly succession planning for key roles.

8.      Defendant John Browne ("Browne") was appointed an Executive Director of BP in 1991 and Group Chief Executive in 1995.

9.      Defendant Byron E. Grote ("Grote") was appointed an Executive Director of BP in 2000 and Chief Financial Officer in 2002.

10.      Defendant David C. Allen ("Allen") was appointed an Executive Director of BP in 2003. He is also a Director of BP Pension Trustees Ltd.

11.      Defendant Iain C. Conn ("Conn") was appointed an Executive Director in July 2004. He is also Chairman of BP Pension Trustees Ltd.

12.      Defendant Tony A. B. Hayward ("Hayward") was appointed an Executive Director of BP in 2003.

13.      Defendant John A. Manzoni ("Manzoni") was appointed an Executive Director of BP in 2003.

14.     Defendants Browne, Grote, Allen, Conn, Hayward, and Manzoni are collectively referred to as the "Executive Directors."

15.     Defendant Peter D. Sutherland ("Sutherland") has been a member of BP's Board since 1995, previously serving from 1992-1993, and was appointed Chairman in 1997.  He serves as Chairman of the Chairman's Committee and Nomination Committee.

16.     Defendant Ian Prosser ("Prosser") has been a member of BP's Board since 1997 and was appointed Non-Executive Deputy Chairman in 1999.  He serves as Chairman of the Audit Committee, and as a member of the Chairman's Committee, Nomination Committee, and Remuneration Committee.

17.     Defendant John H. Bryan ("Bryan") has been a member of BP's Board since 1998.  He serves as a member of the Chairman's Committee, Remuneration Committee, and Audit Committee.

18.     Defendant Antony Burgmans ("Burgmans") has been a member of BP's Board since 2004.  He serves as a member of the Chairman's Committee and Ethics and Environment Assurance Committee.

19.     Defendant Erroll B. Davis, Jr. ("Davis") has been a member of BP's Board since 1998.  He serves as a member of the Chairman's Committee, Audit Committee, and Remuneration Committee.

20.     Defendant Douglas J. Flint ("Flint") has been a member of BP's Board since January 2005.  He serves as a member of the Chairman's Committee and Audit Committee.

21.    Defendant DeAnne S. Julius ("Julius") has been a member of BP's Board since 2001. She serves as the Chairman of the Remuneration Committee and a member of the Chairman's Committee.

22.    Defendant Tom McKillop ("McKillop") has been a member of BP's Board since 2004. He serves as a member of the Chairman's Committee and Remuneration Committee.

23.    Defendant Walter E. Massey ("Massey") has been a member of BP's Board since 1998. He serves as Chairman of the Ethics and Environment Assurance Committee and a member of the Chairman's Committee and Nomination Committee.

24.    Defendants Sutherland, Bryan, Burgmans, Davis, Flint, Julius, McKillop, and Massey, are collectively referred to as the "Non-Executive Directors."

25.    (a)    The defendants, by reason of their status as officers and executives or members of the BP Board of Directors have at all relevant times had the power and influence, and did in fact control and influence and cause and/or allow BP to engage in the unlawful acts and conduct complained of herein. Each of the defendants is liable as a direct participant in, and aider and abetter of, the wrongs complained of herein.

(b)    By reason of their positions and because of their ability to control the business and corporate affairs of BP at all relevant times, the defendants owe and have owed BP and its shareholders fiduciary obligations of fidelity, trust, loyalty, and due care, and were and are: required to use their utmost ability to control and manage BP in a fair, just, and equitable manner; act in furtherance of the best interests of BP and its shareholders so as to benefit all shareholders and not in furtherance of their personal interest or to benefit themselves; and act with complete candor toward the public shareholders. In addition, each director of BP owes and

7

has owed to BP and its shareholders the fiduciary duties to exercise due care and diligence in the administration of the affairs of BP and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

26.     In addition, the defendants serving on the Company's Ethics and Environment Assurance Committee including, during the relevant period, defendants Burgmans and Massey, were charged with specific oversight responsibilities including monitoring, on behalf of the Board, matters relating to the Executive Management's processes to address environmental, health and safety, security and ethical behavior issues.  In addition, the Committee reviews specific risks that are identified in the Company's annual plan and developments in business and functional areas that may emerge during the year.

27.     The defendants, because of their positions of control and authority as executive officers and/or directors of BP, were able to and did, directly and indirectly, control the matters and transactions complained of herein.  These defendants have and have had the duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of the Company; to be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and to conduct the affairs of the Company to provide the highest quality services and maximize the profitability of the Company for the benefit of its shareholders.

## SUBSTANTIVE ALLEGATIONS

28.     On August 7, 2006, BP issued the following press release regarding the problems and related shutdown at Prudhoe Bay:

8

**BP to Shutdown Prudhoe Bay Oil Field**
Release date:  07 August 2006

ANCHORAGE -- BP Exploration Alaska, Inc. has begun an orderly and phased shutdown of the Prudhoe Bay oil field following the discovery of unexpectedly severe corrosion and a small spill from a Prudhoe Bay oil transit line.  Shutting down the field will take days to complete.  Over time, these actions will reduce Alaska North Slope oil production by an estimated 400,000 barrels per day.

The decision follows the receipt on Friday, August 4 of the data from a smart pig run completed in late July.  Analysis of the data revealed 16 anomalies in 12 locations in an oil transit line on the eastern side of the oil field.

In response to the inspection data, BP conducted follow up inspections of anomalies where corrosion-related wall thinning appeared to exceed BP criteria for a continued operation.  It was during these follow up inspections that BP personnel discovered a leak and small spill estimated at 4 to 5 barrels.

The spill has been contained and the clean up effort is underway.  The pipeline was shutdown at 6:30 am Sunday morning.  BP has notified state and federal officials of the decision and will work closely with the U.S. Department of Transportation and the Alaska Department of Environmental Conservation, among others.

"We regret that it is necessary to take this action and we apologize to the nation and the State of Alaska for the adverse impacts it will cause," said BP America Chairman and President Bob Malone.  "However, the discovery of this leak and the unexpected results of this most recent smart pig run have called into question the condition of the oil transit lines at Prudhoe Bay.  We will not resume operation of the field until we and government regulators are satisfied that they can be operated safely and pose no threat to the environment."

BP is identifying and mobilizing additional resources from across Alaska and North America in order to speed inspection of remaining Prudhoe Bay oil transit lines.  BP operates 22 miles of oil transit pipeline at Prudhoe Bay.  Smart pigging inspection has been completed over about 40 percent of that length.

BP previously announced plans to replace a three-mile segment of pipeline following inspections conducted after a large spill discovered on March 2, 2006.

29.      The press release made no mention, however, that BP was conducting the "smart

pig" testing only because it was required to under a Corrective Action Order ("CAO") issued by

the United States Department of Transportation on March 15, 2006 following the spill of

200,000 gallons from the same line in March 2006 -- the worst spill since oil production began

on Alaska's northern slope.  According to the Department of Transportation's preliminary

findings contained in the CAO:

- An internal inspection of Prudhoe Bay west operating area (PBWOA) was last performed in 1998 using high-resolution magnetic flux leakage (MFL) toll.  Respondent has not established a regular internal inspection or maintenance pigging (cleaning pig) program.

- Respondent's leak detection system was not effective in recognizing and identifying the failure.

31.     On August 7, 2006, <u>The New York Times</u> reported that officials at BP could not

determine how long production would be offline and that Tom Williams, BP's senior tax and

royalty counsel does not "even know how long it's going to take to shut [Prudhoe Bay] down."

According to the article, Daren Beaudo, a BP spokesman, said that safety standards require at

least 70 percent of the steel walls of the oil transit pipe to be intact and that inspections found

corrosion had reduced wall thickness below that standard.

32.     Also, on August 7, 2006, <u>The Wall Street Journal</u> reported that the shutdown of

the Prudhoe Bay oil field will "occur over several days" and result in a "curtailment of an

estimated 400,000 barrels a day."  This curtailment amounts to almost half of the total daily

production from fields on the Alaskan Northern Slope.  The article also noted that State and

Federal regulators have launched investigations into the corrosion along BP's oil transit network

including a criminal probe by the Environmental Protection Agency.

33.     On August 8, 2006, BP America, Inc. Chairman and President Bob Malone

announced at a press conference that "it has been necessary to take this drastic action of

[a]...shutdown of the Prudhoe Bay" and that BP has "taken the decision to replace the main oil

transit lines at Prudhoe Bay" in order to ensure "the integrity of the field." No time-line was released in this statement regarding the completion of repairs.

34.     On August 8, 2006, <u>The Wall Street Journal</u> reported that the shutdown of the Prudhoe Bay oil field facility will reduce production by about 400,000 barrels a day for BP, which operates the field, and its partners, including Exxon Mobil Corporation and ConocoPhillips. BP owns about 26% of the Prudhoe Bay oil field and a prolonged shutdown will make it difficult for the company to deliver on its guidance for year-end oil and natural gas production. According to the article, the Prudhoe Bay oil field facility is almost thirty years old and operates with a network of pipelines designed to last only twenty-five years. The article goes on to quote Michael Bolkovatz, a production manager at Prudhoe Bay, as saying that BP wants to stretch the field's life by several more decades and that "the real goal of our program is to make these pipes last another 50 years." The transit line responsible for triggering the field shutdown runs between two processing plants in the eastern portion of the field, and corrosion exceeding 30% of the pipe's walls was detected by a probe - called a "smart pig." Phil Flynn, an analyst and trader at Alaron Corp, a Chicago brokerage firm specializing in energy industry futures, observed that the oil transit network is "under stress like it's never been before" and that it "was never designed to do this much work." Representative John Dingell, a Michigan Democrat, is pushing for a Congressional hearing to investigate the Prudhoe Bay shutdown and released a statement saying that it is "appalling that BP let this critical pipeline deteriorate to the point that a major production shutdown was necessary."

35.     On August 8, 2006, <u>CNNMoney.com</u> reported that the Prudhoe Bay oil field shutdown is the first of its kind and its impact on consumer gas prices and oil futures has pushed

both to near records highs.  Oil analyst Peter Beutel, president of Cameron Hanover, is quoted as saying that shutting down an oil field is an expensive and risky step that is only taken in extreme circumstances and that "once you shut it down, you don't know what will happen when you come back."  Buetel goes on to say that the outage accounts for "almost all Alaska" and that repairs "could drag on for months."  Fadel Gheit, an oil analyst for Oppenheimer & Co., observed that it is well known that oil companies are not doing enough regular maintenance on their infrastructure and that corrosion "has to happen."  Art Smith, chief executive of John S. Herold, a Houston-based energy consulting firm, is quoted as saying that the corrosion "should have been caught sooner."  Charles Clusen, director of the Alaska project for the Natural Resources Defense Council, is quoted as saying this shutdown "was almost guaranteed to happen" because oil companies "have not been putting money into the infrastructure" in Alaska.

36.     On August 9, 2006, The Wall Street Journal reported that Alaska Governor Frank Murkowski directed that state's Attorney General, David Marquez, to investigate Alaska's "state's rights to hold BP fully accountable for losses to the state."  Approximately 89 percent of Alaska's revenue is oil related.  According to the article, Alaska Revenue Commissioner Bill Corbus estimates that the Prudhoe Bay shutdown will cause the state a daily loss of $6.4 million in royalties and taxes.

37.     On August 9, 2006, MSNBC.com reported that a criminal investigation is underway to determine whether BP has "deliberately shortchanged maintenance and falsified records to cover it up."  Chuck Hamel, an advocate for Alaskan oil workers, claims that a dozen past and current BP employees have informed him that they had been instructed to "cut back on a chemical put into the system to retard rust and corrosion, and to falsify records," an allegation

12

also relayed to FBI investigators.  BP acknowledged that a "key maintenance procedure" to

check for sludge - known as "pigging" - had not been performed in more than a decade.  Thomas

J. Barrett, an employee of the Department of Transportation's Office of Pipeline Safety, is

quoted in the article as saying he was "disappointed" with BP's "failure to maintain these lines to

an accepted industry level of care."  Federal regulators assessing the damage observed that the

"walls of the pipes were so corroded that they were almost paper thin."

      38.    On August 9, 2006, <u>Bloomberg</u> published an article charging that BP's problems

at Prudhoe Bay were hardly a surprise, reporting as follows:

### BP 2004 Report Flagged Concern About Alaska Pipelines (Update2)

Aug. 9 (Bloomberg) -- BP Plc was alerted by employees and contractors in a
February 2004 survey that its Prudhoe Bay, Alaska, pipeline network probably
wasn't being adequately monitored for corrosion, according to a company report.

"If we find pipe that we know is rotten, they have to replace it," an unidentified
employee said in the report, posted on BP's Web site.  "My concern, however, is
that they are not taking a look at every piece of pipe that they need to be."

Production from Prudhoe Bay, the largest oilfield in the U.S., is being curtailed
after the company in the past week discovered severe corrosion and a leak.  Crude
climbed as high as $77.45 a barrel in New York, within $1 of a record, after the
company said it would shut the entire field.  Prudhoe Bay produces 400,000
barrels day, 8 percent of U.S. output.

BP America President Robert Malone said on CNN today that the company may
be able to keep half of the field pumping.  The corrosion appears to be less severe
on pipes on the western side of the field and its engineers are assessing whether
those lines can be kept in service.  The eastern half has now been shut down, the
company said.

The Alaska unit used the 2004 survey, prepared by research company McDowell
Group, Inc., "to help formulate plans for future activities," Toby Odone, a
London-based spokesman for BP, said today by telephone.

Cost cuts created "anxiety in the workforce, and that impacts safety," a contractor
and supplier said in the report.  "Contractors, suppliers and the conversion

community were concerned about BP's purported drive to support the highest standards, yet push for reduced costs in its operations."

'Cutting Corners'

The company "has been cutting corners" since around 1999, said Charles Hamel, a former oil broker who today lobbies government regulators on behalf of Alaskan oil industry workers. BP "shareholders were not well served by" the oil producer's cost reductions, he said Aug. 7 in an interview.

BP pared spending on a corrosion inhibitor in its Alaskan pipelines following the costs cuts, Hamel said, citing people, including BP employees, who declined to identify.

Wendy Silcock, a London-based spokeswoman for BP, today said she couldn't immediately comment on whether spending on the inhibitor fell from 1998 to 2000.

BP plans to spend $71 million this year in Alaska on its corrosion monitoring, prevention and repair program, Odone said. That's 15 percent more than last year, he said.

Owners of the Prudhoe Bay field, which accounts for 8 percent of U.S. output, include Exxon Mobil Corp., ConocoPhillips and Chevron Corp.

'Below Standard'

BP Chief Executive Officer John Browne already faces a grand jury probe for a March 2 Alaska spill and allegations of market manipulation in the U.S. propane industry. He's also been fined for a Texas refinery blast that killed 15 workers last year, and there's a separate grand jury investigation for that incident. BP, which gets 40 percent of its sales from the U.S., said last month it will boost spending there to improve safety and maintenance.

BP's pipeline management practices have been inferior to other companies in the oil industry, a regulator said.

"The typical standard of care is far above what we saw from BP's maintenance practices over the past dozen years leading up to the 2 March spill, Thomas Barrett, administrator of the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration, said yesterday in an interview.

Ronnie Chappell, a BP spokesman in Anchorage, wasn't immediately available to comment. Calls to the BP press office in London after normal business hours weren't answered.

March Spill

BP on March 3 said it shut some daily production at Prudhoe Bay after a leak in a pipeline spilled about 6,400 barrels of crude oil.

Some major pipelines, including the 800-mile (1,287- kilometer) Trans-Alaska link, which carries oil from northern Alaska to shipping terminals farther south, are examined and cleaned about once every two weeks by mechanical tools known as pigs. The Prudhoe Bay pipelines feeding into the trunk aren't according to Department of Transportation records.

The department "has not received a reasonable explanation why BP has not scraper-pigged these lines over approximate 14-year period," Deputy Secretary Mario Cino a June letter to a Congressman. "In our opinion, based on current information, this length of time does not represent sound management practices for internal corrosion control."

The Prudhoe Bay pipelines hadn't every been fully inspected with mechanical pigs until now, BP officials told analysts on a conference call yesterday.

Ultrasound Testing

Instead, BP had relied on ultrasonic testing of the links, which run above-ground across the tundra. That ultimately proved ineffective at detecting the extent of corrosion, executives including BP Alaska President Steve Marshall told analysts on the call.

Refineries along the West Coast, particularly those in California and the Pacific Northwest, depend on Prudhoe Bay for crude supplies. Refiners including Valero Energy Corp. and Tesoro Corp. said they can meet near-term requirements for crude.

The U.S. government has offered to release oil from its emergency stockpile if necessary. The nation has 688 million barrels in the Strategic Petroleum Reserve along the Gulf Coast. The U.S. consumes about 21 million barrels of oil a day.

39.     On August 10, 2006, <u>Reuters</u> published the following article in which the details

of the massive cost to BP to remedy the Prudhoe Bay problem began to emerge:

**BP Alaska Repairs to Cost $100 Million, Source Says**

LONDON (Aug. 10) - Oil giant BP Plc expects the replacement of corroded
pipelines at the Prudhoe Bay field in Alaska to cost around $100 million, a
company source said on Thursday, but the total cost to BP will likely be several
times this figure.

The expected cost includes around $20-$30 million for the steel pipeline, the
source said, well above $15 million that one steel analyst estimated on
Wednesday.

The BP source said the higher than predicted cost was because the company was
"a distressed buyer."

A BP spokesman said it was too early to give a figure for repairs at the field, in
which BP has a 26 percent stake, and Exxon Mobil Corp. and ConocoPhillips
own 36 percent each.

BP unexpectedly announced the phased shutdown of the U.S.'s largest oil field on
Sunday to replace 16 miles of pipeline at the field at it discovered severe
corrosion.

As of Wednesday, production has been halved to 200,000 barrels per day and BP,
the world's third largest fully publicly traded oil company by market value,
expects a decision on Friday about whether a full shutdown can be averted.

The company has not put a figure on how much the lost production will cost it but
a spokesman said BP's average profit margin in the U.S. was $25 per barrel. This
suggests a full outage would cost BP $2.6 million per day or $350 million if the
field is fully shut down until the year-end.

The U.S. government does not expect full production to resume before January
2007.

Analysts also expect the loss of Alaska crude to hit profitability at BP's refineries
on the U.S. west coast. These have been integrated into the Alaskan operations
and analysts are concerned the facilities may not have the flexibility to handle
other grades of crude efficiently.

This could see BP miss out on U.S. refining margins, which have been running around record levels in recent months.

Earlier on Thursday, analysts at Sanford C. Bernstein cut their target price on BP's shares to 630 pence from 720 pence to reflect the impact of higher production costs and higher maintenance expenditure following the discovery of the pipeline corrosion.

BP shares traded down 0.97 percent at 6-13-1/2 pence at 1036 GMT, compared to a 1.06 percent fall in the DJ Stoxx European oil and gas sector index.

Around $10 billion has been wiped off BP's market capitalization since the discovery of the corrosion was announced.

## DERIVATIVE ALLEGATIONS

40.    Plaintiff brings this complaint derivatively in the right and for the benefit of BP to redress injuries suffered and to be suffered by BP as a direct result of the violations of fiduciary, common law and civil law, duties by the defendants.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

41.    Plaintiff will adequately and fairly represent the interests of BP and its shareholders in enforcing and prosecuting their rights.

42.    Plaintiff has not made any demand on the Board of Directors of BP to institute this action because such demand would be a futile and useless act for the following reasons:

> (i)    The acts complained of herein constitute violations of fiduciary, common law and civil law, duties owed by BP's Board of Directors and these wrongful acts are incapable of ratification;
>
> (ii)    The Board has failed to commence any action against the principal wrongdoers despite the significant passage of time since the malfeasance came to light;
>
> (iii)    The acts complained of herein are illegal and unreasonable and thus are acts incapable of ratification;

(iv)    In order to bring this action for breach of fiduciary, common law and civil law duties, the members of the BP Board of Directors will be required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, with whom they are well acquainted and with whom they have entangling alliances, interests, and dependencies, which they will not do. They therefore will not be able to vigorously prosecute any such actions. These entangling alliances include defendants Browne and Bryan both presently sit on the board of Goldman Sachs Group Inc; defendants Julius and McKillop served together as directors of Lloyds TSB Group PLC; defendants Sutherland and McKillop both presently are directors of The Royal Bank of Scotland Group; and directors Massey, Davis, and Bryan served together as directors of Amoco;

(v)     BP is currently under criminal investigation by the EPA in connection with the March 2nd 2006 oil spill along the oil transit lines servicing the Prudhoe Bay oil facility. The August 2006 Prudhoe Bay shutdown has led to a pending investigation by the Alaska Attorney General, David Marquez, with possible criminal and civil sanctions. It is inimical for the Board to commence action against the principal wrongdoers in light of the pending criminal and civil investigations, for to do so would further expose and bolster the allegations asserted in these pending investigations; and

(vi)    The members of the BP Board of Directors, including each of the defendants herein, receive substantial benefits, and other emoluments by virtue of their membership on the Board and their control of BP. Bringing an action or even adequately investigating other directors, who have the power to terminate an inside director's employment, would not occur. The defendants are incapable of exercising independent objective judgment in deciding whether to bring this action.

## COUNT I

### (Breach of Fiduciary Duties)

43.    Plaintiff incorporates by reference and reallege each and every allegation as set forth above as if fully set forth herein.

44.    Each defendant owed BP and its shareholders the highest duties of loyalty, honesty, candor and care in conducting their affairs.

18

45.     At a minimum, to discharge these duties, each defendant should have exercised reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of BP. By virtue of these obligations, each defendant was required, <u>inter</u> <u>alia</u>:

     a.     to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of BP;

     b.     to be and remain informed as to how BP was operating and, upon receiving notice or information of an imprudent, questionable, or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and

     c.     to conduct the affairs of BP to provide the highest quality services and maximize the profitability of the Company for the benefit of its shareholders.

46.     The defendants knowingly, intentionally, recklessly or negligently breached their fiduciary duties and, thereby, caused the Company to waste its assets, expend corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which BP has been and continues to be substantially damaged.

47.     Accordingly, plaintiff seeks on behalf of BP monetary damages, injunctive remedies, and other forms of equitable relief.

<b><u>COUNT II</u></b>

<b>(Indemnification)</b>

48.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

19

49.     As alleged herein, the defendants, acting as officers and/or directors of BP and, therefore, as its agents, breached their fiduciary, common law and civil law duties to BP and its shareholders.

50.     BP has suffered significant and substantial injury as a direct result of the defendants' knowing, intentional, or reckless breaches of their fiduciary, common law and civil law duties as alleged herein.  Plaintiff, on behalf of the Company, seeks relief from the defendants on the theory of indemnity to the extent that BP is found liable for the defendants' violations of their fiduciary duties.

**WHEREFORE**, plaintiff prays for judgment as follows:

A.     Declaring that the defendants have breached their fiduciary, common law and civil law duties as alleged herein;

B.     Directing defendants, jointly and severally, to account for all losses and/or damages sustained by BP by reason of the acts and omissions complained of herein;

C.     Requiring defendants to remit to BP all of their salaries and other compensation received for the periods when they breached their duties;

D.     Ordering that defendants and those under their supervision and control refrain from further violations as are alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

E.     Awarding pre-judgment and post-judgment interest as allowed by law;

F.     Awarding plaintiff's attorneys' fees, expert fees, consultant fees, and other costs

and expenses; and

G.     Granting such other and further relief as this Court may deem just and proper.

Dated: August 14, 2006
      New York, New York

                       **STULL STULL & BRODY**

                       Jules Brody (JB-9151)
                       6 East 45th Street
                       New York, New York   10017
                       (212) 687-7230

                       Attorneys for Plaintiff

21

## VERIFICATION

I, SUE PINCUS, under the penalties of perjury, affirm as follows:

I am the plaintiff in the within action;

I have read the foregoing Verified Derivative Complaint and know the contents thereof.
The same is true to the best of my own knowledge, except as to the matters therein alleged on
information and belief, and as to those matters I believe them to be true.

AFFIRMED, under the penalties of perjury at Boca Raton Florida, this
11 day of August, 2006.

Sue Pincus