**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

)
IN RE BP p.l.c. DERIVATIVE LITIGATION        )   Case No. 06-cv-6168 (HB)
)
_____


## CONSOLIDATED AMENDED DERIVATIVE COMPLAINT

Plaintiffs, by and through their attorneys, allege as follows:

### PRELIMINARY STATEMENT

1.      This is a shareholder derivative action brought on behalf and in the name of BP

p.l.c. ("BP" or the "Company") to remedy the severe harm caused to the Company by the

recklessness and numerous breaches of the fiduciary duty owed by BP's senior officers and

directors.  The egregious fiduciary breaches concern a pattern of neglect of BP's operations in

Alaska and Texas, a disregard for human life, a refusal to heed repeated warnings of critical

dangers confronting BP's operations and employees, and a systematic failure to comply with law

and BP's own standards of good corporate governance, as well as the trading practices of BP

traders in their attempt to improperly manipulate the propane, crude oil and gasoline markets.

2.      Specifically, in breach of their fiduciary duties and their own code of corporate

governance, and without regard to the consequences to BP, its shareholders, and third parties, the

defendants allowed one of BP's prized assets, the oil transit pipeline system serving the Prudhoe

Bay, Alaska oil field -- the largest in America, representing 8% of national output -- to decay to

the point that the Eastern half of the field, which accounts for almost three-quarters of the entire

field's output became non-operational.  Defendants first became aware of the corrosion in the

pipeline years ago, but took no substantial steps to remedy the situation.  In March 2006, the

effect of defendants' neglect began to tell when the pipeline leaked 6,400 barrels of crude, the largest spill in the field's history.  Still, defendants took no substantial steps to remedy the situation.  As a result, on August 7, 2006, the Company was forced to shut down Prudhoe Bay's operation when a second leak in the pipeline was discovered.

3.      Despite their awareness of the dangerous effect of the corrosion on the pipeline, defendants repeatedly failed to fund the work necessary to correct the problem, opting instead to squeeze out every last penny in current profits at the expense of properly and safely maintaining the pipeline and the Company's future profitability.  BP now faces hundreds of millions of dollars in costs to remedy the damage, lost earnings, a criminal probe by the Environmental Protection Agency, significant civil and criminal liability, regulatory scrutiny and action and the wrath of customers nationwide who are facing ever higher gasoline prices at the pump.

4.      Defendants further breached their fiduciary duties by their blatant disregard of proper safety standards at BP's refinery in Texas City.  The Texas City refinery is BP's largest in the United States, employing 1,800 people and refining approximately 460,000 barrels of crude a day.  In March 2005, a massive explosion occurred at the Texas City facility as a direct result of numerous safety violations, killing 15 people and injuring 180 others.  BP's own chief executive called it "the worst tragedy that I've known in 38 years with the company."

5.      While the Company initially denied any wrongdoing or negligence in the blast and touted the safety improvement implemented at the Texas City refinery, ultimately BP admitted blame for the disaster.  The Company reported that it was undertaking disciplinary action against several employees, as well as providing compensation and financial support for

families of the deceased and injured employees.  It has further been reported that BP has set aside $1.6 billion for the purpose of resolving the resulting civil claims.

6.     Since the disaster, the Texas City refinery has been the subject of various governmental investigations.  Their findings have been extremely disturbing.  According to one report, the Texas City refinery "was the site of reported malfunctions that could have been prevented."  Additionally, OSHA fined BP a "record $21.3 million and charged the Company with 300 health and safety violations."  Moreover, just within the last couple of weeks, the U.S. Chemical Safety Board concluded that the incident could have been avoided if simple safety procedures were followed and that BP's management was aware of the severe safety problems at the Texas City refinery well before March 2005.  Indeed, as early 1999, "BP embraced the principle that these costs [of human life] can be specified for the purposes of cost benefit analysis."  In 2002, it internally justified continuing neglect of safety by calculating the cost of a human life at $10 million in the event that the "big, bad wolf" huffs and puffs and destroys BP facilities and the little pigs who operate them.

7.     In addition, defendants further breached their fiduciary duties and BP's own internal code of corporate governance, in addition to various federal and state laws and regulations, in their pursuit to control and manipulate the propane, crude oil and gasoline markets.  BP's propane trading team manipulated and drove up the price for propane in the U.S. Midwest and Northeast in February 2004 by buying up all available propane in the market.  This was done in an attempt to "control the market at will."  The team's tactics had been perfected by a previous "trial run" squeeze on the propane market that BP instigated in April 2003.

8.     At the same time, BP is accused of trading irregularities in its global over-the-counter crude oil trades in 2003 and 2004, as well as trading in gasoline on the New York Mercantile Exchange in 2002.  The Company is accused of using inside information about its own oil-delivery system in an attempt to influence crude-oil benchmarks which, in turn, would influence billions of dollars in transactions.

9.     The attempts to manipulate these markets were initiated with the full knowledge and acceptance of senior executives at BP.  Indeed, all involved understood that what they were doing had pushed the envelope.  In a document entitled "Lessons Learned," produced by BP in 2004 after its attempt to corner the propane market, it stated that the actions "could increase the risk of regulatory intervention."  Indeed, the defendants' scheme to corner the propane market, as well as their scheme to manipulate the crude oil and gasoline markets, has attracted the attention of not only the U.S. Justice Department in two separate criminal probes, but of the Commodity Futures Trading Commission and the New York Mercantile Exchange in separate civil complaints, investigations and fines.

10.     As a result of defendants' gross disregard for the fiduciary duties owed to BP and its shareholders, BP has suffered, and will continue to suffer, billions of dollars in damages. Plaintiffs, through this complaint seek to recover those damages, and to assure that similar conduct does not occur in the future.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States.  This action was not brought

collusively to confer jurisdiction on a court of the United States that it would not otherwise have.
Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, the
Company maintains offices and conducts substantial business in this District including the
oversight of the Company's American operations.

## THE PARTIES

12.     Plaintiffs, Jonathan Gross and Sue Pincus, each hold shares of BP and held those
shares at the time of the wrongful conduct enumerated herein.

13.     Nominal Defendant BP is a public limited company registered in England and
Wales.  The Company was created in 1998 as a result of the merger of Amoco Corporation and
the British Petroleum Company p.l.c.  BP maintains three operating business segments:
Exploration and Production; Refining and Marketing; and Gas, Power and Renewables.
Approximately 40% of the Company's fixed assets are located in the U.S.A.  BP has a strong
refining and marketing presence in the U.S.A.; marketing under the Amoco and BP brands in the
Midwest, East, and Southeast, and under the Arco brand on the West Coast.  The Company is
also involved in power projects in the U.S.A.  For the years ended December 31, 2003, 2004, and
2005, the U.S.A. accounted for the single largest source of the Company's sales and operating
revenues categorized by geographical area.  Within its Exploration and Production operating
business segment, the Company performs upstream activities (oil and natural gas exploration and
field development and production) and midstream activities (management of crude oil and
natural gas processing facilities).  According to the Company's public filings with the SEC, the
Trans Alaska Pipeline System is first among its "most significant midstream pipeline interests."
More importantly, in terms of its upstream activities, including oil production, the Company lists

Prudhoe Bay as its most productive field for per day net production.  Additionally, BP's Texas

City refinery is its largest refinery in the United States, employing 1,800 people and refining

460,000 barrels of crude-oil each day.  The U.S.A. also represents the Company's single largest

concentration of employees worldwide reported by geographical area.

14.    BP is governed by a Board of Directors, currently composed of nine Non-

Executive Directors, including the Chairman, and six Executive Directors.  The Chairman and

Non-Executive Directors of BP are elected each year and, subject to BP's Articles of

Association, serve on the basis of letters of appointment.  Executive Directors of BP have service

contracts with the Company.  In its Form 20-F, BP states that:

> Governance is not an exercise in compliance nor is it a higher form of
> management.  Governance is a more powerful concept.  It has a clear objective:
> ensuring the pursuit of the Company's purpose.  The board's activity is focused
> on this task, which is unique to it as the representative of BP's owners.  This task
> is discharged by the board through undertaking such activities as are necessary for
> the effective promotion of long-term shareholder interest.  In promoting the long-
> term interest of shareholders, the board has to ensure that the business is
> responsive to the views of those with whom it comes into contact.  This can
> include gaining an understanding of the environmental and social consequences
> of the Company's actions.  However, it remains a matter of business judgement as
> to how these consequences are properly taken into account in maximizing
> shareholder value.
>
> Governance is the system by which the Company's owners and their
> representatives on the board ensure that it pursues, does not deviate from and only
> allocates resources to its defined purpose.
>
> As a Company, we recognize the importance of good governance and that it is a
> discrete task from management.  Clarity of roles is key to our approach.  Policies
> and processes depend on the people who operate them.  Governance requires
> distinct skills and processes.  Governance is overseen by the BP board, while
> management is delegated to the group chief executive by means of the board
> governance policies.
>
> Our board governance policies use a coherent, principles-based approach, which
> anticipated many developments in UK governance regulation.  These policies

ensure that our board and management operate within a clear and efficient governance framework that places long-term shareholder interest at the heart of all we do.

To that end, our board exercises judgement in carrying out its work in policy-making, in monitoring executive action and in its active consideration of Group strategy.  The board's judgements seek to maximize the expected value of shareholders' interest in the Company, rather than eliminate the possibility of any adverse outcomes.

* * *

Our board is accountable to shareholders for the performance and activities of the entire BP Group.  It embeds shareholder interest in the goals established for the Company.

* * *

The efficiency and effectiveness of the board are of paramount importance.  Our board is large but this is necessary to allow sufficient executive director representation to cover the breadth of the Group's business activities and sufficient non-executive representation to reflect the scale and complexity of BP and to staff our board committees.  A board of this size allows orderly succession planning for key roles.

15.     Defendant John Browne ("Browne") was appointed an Executive Director of BP in 1991 and Group Chief Executive in 1995.

16.     Defendant Byron E. Grote ("Grote") was appointed an Executive Director of BP in 2000 and Chief Financial Officer in 2002.

17.     Defendant David C. Allen ("Allen") was appointed an Executive Director of BP in 2003.  He is also a Director of BP Pension Trustees Ltd.

18.     Defendant Iain C. Conn ("Conn") was appointed an Executive Director in July 2004.  He is also Chairman of BP Pension Trustees Ltd.

19.     Defendant Tony A. B. Hayward ("Hayward") was appointed an Executive Director of BP in 2003.

7

20.     Defendant John A. Manzoni ("Manzoni") was appointed an Executive Director of BP in 2003.

21.     Defendant Peter D. Sutherland ("Sutherland") has been a member of BP's Board since 1995, previously serving from 1992-1993, and was appointed Chairman in 1997.  He serves as Chairman of the Chairman's Committee and Nomination Committee.

22.     Defendant Ian Prosser ("Prosser") has been a member of BP's Board since 1997 and was appointed Non-Executive Deputy Chairman in 1999.  He serves as Chairman of the Audit Committee, and as a member of the Chairman's Committee, Nomination Committee, and Remuneration Committee.

23.     Defendant John H. Bryan ("Bryan") has been a member of BP's Board since 1998.  He serves as a member of the Chairman's Committee, Remuneration Committee, and Audit Committee.

24.     Defendant Antony Burgmans ("Burgmans") has been a member of BP's Board since 2004.  He serves as a member of the Chairman's Committee and Ethics and Environment Assurance Committee.

25.     Defendant Erroll B. Davis, Jr. ("Davis") has been a member of BP's Board since 1998.  He serves as a member of the Chairman's Committee, Audit Committee, and Remuneration Committee.

26.     Defendant Douglas J. Flint ("Flint") has been a member of BP's Board since January 2005.  He serves as a member of the Chairman's Committee and Audit Committee.

27.     Defendant DeAnne S. Julius ("Julius") has been a member of BP's Board since 2001.  She serves as the Chairman of the Remuneration Committee and a member of the Chairman's Committee.

28.     Defendant Tom McKillop ("McKillop") has been a member of BP's Board since 2004.  He serves as a member of the Chairman's Committee and Remuneration Committee.

29.     Defendant Walter E. Massey ("Massey") has been a member of BP's Board since 1998.  He serves as Chairman of the Ethics and Environment Assurance Committee and a member of the Chairman's Committee and Nomination Committee.

30.     Defendant William H. Castell ("Castell") was appointed as a Non-Executive Director of BP in July 2006.

31.     Defendant Michael P. Miles ("Miles") served as a Non-Executive Director of BP from 1994 until April 2006.  He was also the Chairman of BP Pension Trustees Ltd.

32.     Defendant H. Wilson ("Wilson") served as a Non-Executive Director of BP from 1998 until February 2006.

33.     Defendant Robin B. Nicholson ("Nicholson") served as a Non-Executive Director of BP from 1987 until 2005.

34.     Defendant Charles F. Knight ("Knight") served as a Non-Executive Director of BP from 1987 until 2005.

35.     Defendant Floris A. Maljers ("Maljers") served as a Non-Executive Director of BP from 1998 until 2004.

36.     Defendant Richard L. Olver ("Olver") served as a BP Executive Director from 1998 to July 2004 and served as BP's Deputy CEO from 2003 until July 2004.

9

37.     Defendant Rodney F. Chase ("Chase") served as a BP Executive Director and Deputy CEO from 1992 until 2003.

38.     Defendant John G.S. Buchanan ("Buchanan") served as a BP Executive Director and CFO from 1996 until November 2002.

39.     Defendant William Douglas Ford ("Ford") served as a BP Executive Director and as CEO of BP's Refining and Marketing Division from 2000 until 2002.

40.     Defendant Robert A. Malone ("Malone") has served as Chairman and President of BP America since June 2006.

41.     Defendant Ross J. Pillari ("Pillari") served as the President of BP America until June 2006.

42.     Defendant Mark Radley ("Radley") was the trading manager of North American Gas and Power ("NAGP"), BP's trading arm in North America, during the relevant time period.

43.     Defendant Dennis Abbott ("Abbott") was a BP trader at the propane trading desk and worked under Mark Radley, during the relevant time period.

44.     Defendant Cody Claborn ("Claborn") was a BP trader at the propane trading desk and worked under Mark Radley, during the relevant time period.

45.     Defendant Cameron Byers ("Byers") was Chief Executive of NAGP during the relevant time period.

46.     Defendant Martin Marz ("Marz") was the trading compliance manager of NAGP during the relevant time period.

47.     Defendant James Summers ("Summers") was the Vice President of natural gas liquids trading within NAGP and served as Radley's, Abbott's, and Claborn's superior during the relevant time period.

48.     Radley, Abbott, Claborn, Byers, Marz and Summers herein shall be collectively referred to as the "BP Traders."

49.     The identities of John Does 1-20 are currently unknown to plaintiffs at this time because full disclosure of the culpable parties has not been made.

50.     The individual defendants listed in paragraphs 15 through 49 herein shall be collectively referred to as the "defendants."

51.     (a)     The defendants, by reason of their status as officers, executives, members of the BP Board of Directors, or traders have at all relevant times the power and influence, and did in fact control, influence, cause and/or allowed BP to engage in the unlawful acts and conduct complained of herein.  Each of the defendants is liable as a direct participant in, and aider and abetter of, the wrongs complained of herein.

(b)     By reason of their positions and because of their ability to control the business and corporate affairs of BP at all relevant times, the defendants owe and have owed BP and its shareholders fiduciary obligations of fidelity, trust, loyalty, and due care, and were and are:  required to use their utmost ability to control and manage BP in a fair, just, and equitable manner; act in furtherance of the best interests of BP and its shareholders so as to benefit all shareholders and not in furtherance of their personal interest or to benefit themselves; and act with complete candor toward the public shareholders.  In addition, each director of BP owes and has owed to BP and its shareholders the fiduciary duties to exercise due care and diligence in the

administration of the affairs of BP and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

52.     In addition, the defendants serving on the Company's Ethics and Environment Assurance Committee including, during the relevant period, defendants Burgmans and Massey, were charged with specific oversight responsibilities including monitoring, on behalf of the Board, matters relating to the Executive Management's processes to address environmental, health and safety, security and ethical behavior issues.  In addition, the Committee reviews specific risks that are identified in the Company's annual plan and developments in business and functional areas that may emerge during the year.

53.     The defendants, because of their positions of control and authority as executive officers and/or directors of BP, or traders were able to and did, directly and indirectly, control the matters and transactions complained of herein.  These defendants have and have had the duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of the Company; to be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and to conduct the affairs of the Company to provide the highest quality services and maximize the profitability of the Company for the benefit of its shareholders.

## SUBSTANTIVE ALLEGATIONS

### Prudhoe Bay Shutdown

54.     On August 7, 2006, BP issued the following press release regarding the problems and related shutdown at Prudhoe Bay:

12

ANCHORAGE -- BP Exploration Alaska, Inc. has begun an orderly and phased shutdown of the Prudhoe Bay oil field following the discovery of unexpectedly severe corrosion and a small spill from a Prudhoe Bay oil transit line. Shutting down the field will take days to complete. Over time, these actions will reduce Alaska North Slope oil production by an estimated 400,000 barrels per day.

The decision follows the receipt on Friday, August 4 of the data from a smart pig run completed in late July. Analysis of the data revealed 16 anomalies in 12 locations in an oil transit line on the eastern side of the oil field.

In response to the inspection data, BP conducted follow up inspections of anomalies where corrosion-related wall thinning appeared to exceed BP criteria for a continued operation. It was during these follow up inspections that BP personnel discovered a leak and small spill estimated at 4 to 5 barrels.

The spill has been contained and the clean up effort is underway. The pipeline was shutdown at 6:30 am Sunday morning. BP has notified state and federal officials of the decision and will work closely with the U.S. Department of Transportation and the Alaska Department of Environmental Conservation, among others.

"We regret that it is necessary to take this action and we apologize to the nation and the State of Alaska for the adverse impacts it will cause," said BP America Chairman and President Bob Malone. "However, the discovery of this leak and the unexpected results of this most recent smart pig run have called into question the condition of the oil transit lines at Prudhoe Bay. We will not resume operation of the field until we and government regulators are satisfied that they can be operated safely and pose no threat to the environment."

BP is identifying and mobilizing additional resources from across Alaska and North America in order to speed inspection of remaining Prudhoe Bay oil transit lines. BP operates 22 miles of oil transit pipeline at Prudhoe Bay. Smart pigging inspection has been completed over about 40 percent of that length.

BP previously announced plans to replace a three-mile segment of pipeline following inspections conducted after a large spill discovered on March 2, 2006.

55.     The press release made no mention, however, that BP was conducting the "smart

pig" testing only because it was required to under a Corrective Action Order ("CAO") issued by

the United States Department of Transportation on March 15, 2006 following the spill of

200,000 gallons from the same line in March 2006 -- the worst spill since oil production began

on Alaska's northern slope.  According to the Department of Transportation's preliminary

findings contained in the CAO:

> An internal inspection of Prudhoe Bay west operating area (PBWOA) was last
> performed in 1998 using high-resolution magnetic flux leakage (MFL) toll.
> Respondent has not established a regular internal inspection or maintenance
> pigging (cleaning pig) program.
>
> Respondent's leak detection system was not effective in recognizing and
> identifying the failure.

56.     On August 7, 2006, The New York Times reported that officials at BP could not

determine how long production would be offline and that Tom Williams, BP's senior tax and

royalty counsel does not "even know how long it's going to take to shut [Prudhoe Bay] down."

According to the article, Daren Beaudo, a BP spokesman, said that safety standards require at

least 70 percent of the steel walls of the oil transit pipe to be intact and that inspections found

corrosion had reduced wall thickness below that standard.

57.     Also, on August 7, 2006, The Wall Street Journal reported that the shutdown of

the Prudhoe Bay oil field will "occur over several days" and result in a "curtailment of an

estimated 400,000 barrels a day."  This curtailment amounts to almost half of the total daily

production from fields on the Alaskan Northern Slope.  The article also noted that State and

Federal regulators have launched investigations into the corrosion along BP's oil transit network,

including a criminal probe by the Environmental Protection Agency.

58.     On August 8, 2006, BP America, Inc. Chairman and President Bob Malone

announced at a press conference that "it has been necessary to take this drastic action of

[a]...shutdown of the Prudhoe Bay" and that BP has "taken the decision to replace the main oil

14

transit lines at Prudhoe Bay" in order to ensure "the integrity of the field."  No time-line was released in this statement regarding the completion of repairs.

59.     On August 8, 2006, The Wall Street Journal reported that the shutdown of the Prudhoe Bay oil field facility will reduce production by about 400,000 barrels a day for BP, which operates the field, and its partners, including Exxon Mobil Corporation and ConocoPhillips.  BP owns about 26% of the Prudhoe Bay oil field and a prolonged shutdown will make it difficult for the Company to deliver on its guidance for year-end oil and natural gas production.  According to the article, the Prudhoe Bay oil field facility is almost thirty years old and operates with a network of pipelines designed to last only twenty-five years.  The article goes on to quote Michael Bolkovatz, a production manager at Prudhoe Bay, as saying that BP wants to stretch the field's life by several more decades and that "the real goal of our program is to make these pipes last another 50 years."  The transit line responsible for triggering the field shutdown runs between two processing plants in the eastern portion of the field, and corrosion exceeding 30% of the pipe's walls was detected by a probe - called a "smart pig."  Phil Flynn, an analyst and trader at Alaron Corp, a Chicago brokerage firm specializing in energy industry futures, observed that the oil transit network is "under stress like it's never been before" and that it "was never designed to do this much work."  Representative John Dingell, a Michigan Democrat, is pushing for a Congressional hearing to investigate the Prudhoe Bay shutdown and released a statement saying that it is "appalling that BP let this critical pipeline deteriorate to the point that a major production shutdown was necessary."

60.     On August 8, 2006, CNNMoney.com reported that the Prudhoe Bay oil field shutdown is the first of its kind and its impact on consumer gas prices and oil futures has pushed

both to near record highs.  Oil analyst Peter Beutel, president of Cameron Hanover, is quoted as saying that shutting down an oil field is an expensive and risky step that is only taken in extreme circumstances and that "once you shut it down, you don't know what will happen when you come back."  Buetel goes on to say that the outage accounts for "almost all Alaska" and that repairs "could drag on for months."  Fadel Gheit, an oil analyst for Oppenheimer & Co., observed that it is well known that oil companies are not doing enough regular maintenance on their infrastructure and that corrosion "has to happen."  Art Smith, chief executive of John S. Herold, a Houston-based energy consulting firm, is quoted as saying that the corrosion "should have been caught sooner."  Charles Clusen, director of the Alaska project for the Natural Resources Defense Council, is quoted as saying this shutdown "was almost guaranteed to happen" because oil companies "have not been putting money into the infrastructure" in Alaska.

61.     On August 9, 2006, The Wall Street Journal reported that Alaska Governor Frank Murkowski directed that state's Attorney General, David Marquez, to investigate Alaska's "state's rights to hold BP fully accountable for losses to the state."  Approximately 89 percent of Alaska's revenue is oil related.  According to the article, Alaska Revenue Commissioner Bill Corbus estimates that the Prudhoe Bay shutdown will cause the state a daily loss of $6.4 million in royalties and taxes.

62.     On August 9, 2006, MSNBC.com reported that a criminal investigation is underway to determine whether BP has "deliberately shortchanged maintenance and falsified records to cover it up."  Chuck Hamel, an advocate for Alaskan oil workers, claims that a dozen past and current BP employees have informed him that they had been instructed to "cut back on a chemical put into the system to retard rust and corrosion, and to falsify records," an allegation

also relayed to FBI investigators.  BP acknowledged that a "key maintenance procedure" to check for sludge - known as "pigging" - had not been performed in more than a decade.  Thomas J. Barrett, an employee of the Department of Transportation's Office of Pipeline Safety, is quoted in the article as saying he was "disappointed" with BP's "failure to maintain these lines to an accepted industry level of care."  Federal regulators assessing the damage observed that the "walls of the pipes were so corroded that they were almost paper thin."

63.    On August 9, 2006, Bloomberg published an article charging that BP's problems at Prudhoe Bay were hardly a surprise, reporting as follows:

**BP 2004 Report Flagged Concern About Alaska Pipelines (Update2)**

Aug. 9 (Bloomberg) -- BP Plc was alerted by employees and contractors in a February 2004 survey that its Prudhoe Bay, Alaska, pipeline network probably wasn't being adequately monitored for corrosion, according to a company report.

"If we find pipe that we know is rotten, they have to replace it," an unidentified employee said in the report, posted on BP's Web site.  "My concern, however, is that they are not taking a look at every piece of pipe that they need to be."

Production from Prudhoe Bay, the largest oilfield in the U.S., is being curtailed after the company in the past week discovered severe corrosion and a leak.  Crude climbed as high as $77.45 a barrel in New York, within $1 of a record, after the company said it would shut the entire field.  Prudhoe Bay produces 400,000 barrels a day, 8 percent of U.S. output.

BP America President Robert Malone said on CNN today that the company may be able to keep half of the field pumping.  The corrosion appears to be less severe on pipes on the western side of the field and its engineers are assessing whether those lines can be kept in service.  The eastern half has now been shut down, the company said.

The Alaska unit used the 2004 survey, prepared by research company McDowell Group, Inc., "to help formulate plans for future activities," Toby Odone, a London-based spokesman for BP, said today by telephone.

Cost cuts created "anxiety in the workforce, and that impacts safety," a contractor and supplier said in the report.  "Contractors, suppliers and the conversion

17

community were concerned about BP's purported drive to support the highest standards, yet push for reduced costs in its operations."

'Cutting Corners'

The company "has been cutting corners" since around 1999, said Charles Hamel, a former oil broker who today lobbies government regulators on behalf of Alaskan oil industry workers.  BP "shareholders were not well served by" the oil producer's cost reductions, he said Aug. 7 in an interview.

BP pared spending on a corrosion inhibitor in its Alaskan pipelines following the costs cuts, Hamel said, citing people, including BP employees, who declined to identify.

Wendy Silcock, a London-based spokeswoman for BP, today said she couldn't immediately comment on whether spending on the inhibitor fell from 1998 to 2000.

BP plans to spend $71 million this year in Alaska on its corrosion monitoring, prevention and repair program, Odone said.  That's 15 percent more than last year, he said.

Owners of the Prudhoe Bay field, which accounts for 8 percent of U.S. output, include Exxon Mobil Corp., ConocoPhillips and Chevron Corp.

'Below Standard'

BP Chief Executive Officer John Browne already faces a grand jury probe for a March 2 Alaska spill and allegations of market manipulation in the U.S. propane industry.  He's also been fined for a Texas refinery blast that killed 15 workers last year, and there's a separate grand jury investigation for that incident.  BP, which gets 40 percent of its sales from the U.S., said last month it will boost spending there to improve safety and maintenance.

BP's pipeline management practices have been inferior to other companies in the oil industry, a regulator said.

"The typical standard of care is far above what we saw from BP's maintenance practices over the past dozen years leading up to the 2 March spill, Thomas Barrett, administrator of the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration, said yesterday in an interview.

Ronnie Chappell, a BP spokesman in Anchorage, wasn't immediately available to comment.  Calls to the BP press office in London after normal business hours weren't answered.

March Spill

BP on March 3 said it shut some daily production at Prudhoe Bay after a leak in a pipeline spilled about 6,400 barrels of crude oil.

Some major pipelines, including the 800-mile (1,287- kilometer) Trans-Alaska link, which carries oil from northern Alaska to shipping terminals farther south, are examined and cleaned about once every two weeks by mechanical tools known as pigs.  The Prudhoe Bay pipelines feeding into the trunk aren't according to Department of Transportation records.

The department "has not received a reasonable explanation why BP has not scraper-pigged these lines over an approximate 14-year period," Deputy Secretary Mario Cino said in a June letter to a Congressman.  "In our opinion, based on current information, this length of time does not represent sound management practices for internal corrosion control."

The Prudhoe Bay pipelines hadn't ever been fully inspected with mechanical pigs until now, BP officials told analysts on a conference call yesterday.

Ultrasound Testing

Instead, BP had relied on ultrasonic testing of the links, which run above-ground across the tundra.  That ultimately proved ineffective at detecting the extent of corrosion, executives including BP Alaska President Steve Marshall told analysts on the call.

Refineries along the West Coast, particularly those in California and the Pacific Northwest, depend on Prudhoe Bay for crude supplies.  Refiners including Valero Energy Corp. and Tesoro Corp. said they can meet near-term requirements for crude.

The U.S. government has offered to release oil from its emergency stockpile if necessary.  The nation has 688 million barrels in the Strategic Petroleum Reserve along the Gulf Coast.  The U.S. consumes about 21 million barrels of oil a day.

64.   On August 10, 2006, <u>Reuters</u> published the following article in which the details of the massive cost to BP to remedy the Prudhoe Bay problem began to emerge:

**BP Alaska Repairs to Cost $100 Million, Source Says**

LONDON (Aug. 10) - Oil giant BP Plc expects the replacement of corroded pipelines at the Prudhoe Bay field in Alaska to cost around $100 million, a company source said on Thursday, but the total cost to BP will likely be several times this figure.

The expected cost includes around $20-$30 million for the steel pipeline, the source said, well above $15 million that one steel analyst estimated on Wednesday.

The BP source said the higher than predicted cost was because the company was "a distressed buyer."

A BP spokesman said it was too early to give a figure for repairs at the field, in which BP has a 26 percent stake, and Exxon Mobil Corp. and ConocoPhillips own 36 percent each.

BP unexpectedly announced the phased shutdown of the U.S.'s largest oil field on Sunday to replace 16 miles of pipeline at the field as it discovered severe corrosion.

As of Wednesday, production has been halved to 200,000 barrels per day and BP, the world's third largest fully publicly traded oil company by market value, expects a decision on Friday about whether a full shutdown can be averted.

The company has not put a figure on how much the lost production will cost it but a spokesman said BP's average profit margin in the U.S. was $25 per barrel.  This suggests a full outage would cost BP $2.6 million per day or $350 million if the field is fully shut down until the year-end.

The U.S. government does not expect full production to resume before January 2007.

Analysts also expect the loss of Alaska crude to hit profitability at BP's refineries on the U.S. west coast.  These have been integrated into the Alaskan operations and analysts are concerned the facilities may not have the flexibility to handle other grades of crude efficiently.

This could see BP miss out on U.S. refining margins, which have been running around record levels in recent months.

Earlier on Thursday, analysts at Sanford C. Bernstein cut their target price on BP's shares to 630 pence from 720 pence to reflect the impact of higher production costs and higher maintenance expenditure following the discovery of the pipeline corrosion.

BP shares traded down 0.97 percent at 6-13-1/2 pence at 1036 GMT, compared to a 1.06 percent fall in the DJ Stoxx European oil and gas sector index.

Around $10 billion has been wiped off BP's market capitalization since the discovery of the corrosion was announced.

65.    On August 26, 2006, The Seattle Times reported that concerns raised with BP in November 2001 by Coffman Engineers about the way BP was tracking and reporting Prudhoe Bay pipeline corrosion were rejected by BP.  Coffman had been retained by the state of Alaska and revised an "extremely negative" draft report at BP's insistence.  The revisions are now part of a federal grand jury investigation of BP, as well as investigations by the Environmental Protection Agency, the U.S. Department of Transportation Office of Pipeline Safety, and the Attorney General of Alaska.

66.    Even to this date, the defendants continue to breach their fiduciary duties as they relate to the problems in Prudhoe Bay by failing to comply with the requirements specified in the Corrective Action Order issued by the U.S. Department of Transportation's Pipeline and Hazardous Materials and Safety Administration.  In an October 6, 2006 letter issued by the U.S. Committee on Energy and Commerce, the Committee makes it clear that BP had failed to address numerous key questions contained in the Compliance Order regarding the spills on the Prudhoe Bay Western Operating Line (WOL) and the Prudhoe Bay Eastern Operating Line (EOL).  In addition, the letter points out that BP was aware as early as 2001 that the lines

possibly contained unacceptable amounts of solids and that the lines should be pigged.

According to the Committee's letter:

> Among the several items in the CAO was a requirement that BPXA "pig" several pipelines including the EOL and WOL. Subsequent to the issuance of the CAO, it was revealed that large sections of both the WOL and the EOL contained potentially significant amounts of scale, sludge, and/or other solids. For several months, following the issuance of the March CAO, BPXA attempted to develop solutions to (a) determine the amount of solids in each line, and (b) determine if and how it could pig three lines as required by the CAO. In early August of this year, BPXA discovered, after pigging part of the EOL, that numerous instances of corrosion existed. Upon learning of this corrosion, BPXA subsequently ordered the shutdown of the Prudhoe Bay field.

> In our September 7, 2006, hearing, BPXA acknowledged that it should have pigged both the WOL and EOL more frequently and that it had been caught off guard by the amounts of solids that were presently in these lines, particularly the EOL. However, this Compliance Order shows that BPXA was aware in at least 2001 that these lines possibly contained unacceptable amounts of solids and that the lines should be pigged. On page 5 of the Order are the following requirements:

> --    Determine sediment levels in EOL and WOL pipelines at Skid to 50. [by 3/31/02]
> --    Modify EOL pig receiver at Skid 50. [by 3/31/02]
> --    Pig EOA pipeline from PS - 1 launcher to Skid 50. [by 6/30/02]
> --    Pig WOL pipeline segments if necessary. [by 9/30/02]
> --    Test and select flow meters at EOL pipelines, Skid 50 if necessary. [by 9/30/02]
> --    Complete WOL crude oil flow smoothing modifications. [by 12/31/02]
> --    Install and test meters on all pipelines. [by 12/31/02]
> --    Evaluate and establish leak detection systems' compliance. [by 12/31/02]

> Had these actions been taken, BPXA would likely have been in a better position to understand the conditions that were forming in both the WOL and EOL -- conditions that ultimately resulted in the failures of these lines. However, it is unclear which, if any, of these actions occurred. Given the potential seriousness of this Order, and the direct relevance to the matters that occurred on both the Western and Eastern lines, we ask that you respond to the following questions by no later than Friday, October 20, 2006:

> 1.    Was this Order received by BPXA? If so, by whom, and what actions were taken? If certain of these actions were not taken, explain what not.

2.      The order is signed by a BPXA employee named Mr. Jack M. Fritts who is identified as the Greater Prudhoe Bay Unit Operations Manager.  Does Mr. Jack M. Fritts still hold this position with the company?  If not, is Mr. Fritts still employed by BPXA?  If not, explain why not and provide the Committed with any documents surrounding his departure.  Who did Mr. Fritts report to when this Order was signed, and is that person still employed by BPXA?

3.      Why was this Order not provided to the Committee by BPXA pursuant to the Committee's document request letter dated August 31, 2006?

4.      Prior to their sworn testimony before the Committee on September 7, 2006, was either Mr. Robert A. Malone or Mr. Steve Marshall briefed on or otherwise made aware of the existence of this Compliance Order?  If not, why not?  If so, why didn't either of them discuss the Order in their written testimony, oral testimony, or in response to questions posed by members of the Committee?

67.      In addition, on October 9, 2006, <u>The Wall Street Journal</u>, reported that the lack of oil flowing through the Trans-Alaska Pipeline due to the partial Prudhoe Bay shutdown is causing vibrations which could detrimentally affect the pipeline.  Specifically, the article stated:

The vibrations have spurred a former pipeline official to bring the issue to the attention of Sen. Lisa Murkowski of Alaska.  The pipeline is a vital link to U.S. energy needs, transporting roughly 15% of domestic oil supplies.

Glen Plumlee, who retired this year as a strategic planning coordinator for pipeline operator **Alyeska Pipeline Service** Co., said in a Sept. 22 letter to Ms. Murkowski that some current pipeline workers fear that the vibrations could cause damage to the pipe's supports.  A spokesman for Ms. Murkowski said the senator has received the letter from Mr. Plumlee and she plans to meet with him this week in Anchorage to hear more.

* * *

Mr. Plumlee has been assisting investigators in a criminal probe by the Federal Bureau of Investigation and Environmental Protection Agency into operations of the Alaska pipeline.  The EPA is conducting a separate criminal probe into BP's operations at Prudhoe Bay.  BP and Alyeska officials have denied knowledge of any criminal wrongdoing.

23

68.     On October 24, 2006, BP announced a third quarter profit decline of 3.6% due to, among other things, lost Alaska production.

69.     Finally, on November 1, 2006, it was reported that BP would finally replace the head of its Alaskan unit, BP Exploration (Alaska), due to the faulty maintenance and shoddy management of the Prudhoe Bay production facility and pipeline.  On January 1, 2007, Doug Suttles will replace Steve Marshall as President of BP Exploration (Alaska).

### The Texas City Explosion

70.     BP's blanket disregard for compliance, safety and even human life itself reached to other facilities in the United States.

71.     As far back as 1999, when BP acquired Amoco, Robert Mancini, a BP consultant, stated in an e-mail to a colleague in bold letters: "Cost of A Human Life."  BP embraced the principle that these costs can be specified for the purposes of cost benefit analysis.  Amoco was generally unwilling to take this step."  This callous disregard for human life and BP's own employees was reported on November 7, 2006 by the Financial Times, which also noted that BP document dated October 17, 2002 likened its staff to the "three little pigs" and a massive accident as the "big, bad wolf," asking "which type of house should the piggy build?"  BP chose the house of straw because it pegged the cost of human life at merely $10 million, thus justifying continuing neglect of safety.

72.     On March 24, 2005, The New York Times reported a massive explosion at BP's oil refinery in Texas City, ultimately killing 15 people and injuring 180.  According to the article:

> The plant, BP's largest in the nation, has 1,800 employees, is spread over 1,200 acres and refines 460,000 barrels of crude oil a day.  It is considered "the most

complex facility in the world," said another company spokesman, Hugh Depland. The plant is still operating.

Almost a year ago, on March 21, 2004, a series of explosions rocked the refinery, with no reported loss of life.  In April 1947, Texas City was the site of the country's worst accident when ammonium nitrate stored in two ships docked at the port exploded, nearly obliterating Texas City and claiming at least 576 lives.

In the wake of Wednesday's explosion, a seven-member investigation team from the United States Chemical Safety Board was scheduled to arrive at the site Thursday.  John S. Breland, a board member, called it "a very serious accident" and described the situation as "very bad."

Neil Chapman, a BP spokesman, said the plant had been shut down for its annual major maintenance, a process called "turnaround," and it was gradually being brought back on stream when the explosion occurred.  Industry experts pointed out that explosions at refineries have usually happened during the turnaround, when processes are in flux, rather than when a unit is fully up.

73.    On March 25, 2005, The New York Times further reported that at a news conference Defendant Browne called it "the worst tragedy that I've known in 38 years with the company."  In response to questions regarding the plant's safety record, he said the plant, "has improved enormously."  Defendant Browne further promised that there would be "no stone left unturned in making sure events are investigated and that remediation is done."

74.    News regarding other safety violations at the Texas City plant began to surface. On March 27, 2005, the Houston Chronicle reported:

When viewed through the context of the past, Wednesday's explosion becomes all the more disturbing.

In the past year, the Occupational Safety and Health Administration fined BP almost $172,000 for safety incidents at the Texas City refinery.

The latest fine - nearly $110,000 - came earlier this month and stemmed from a September accident that killed two workers.

Then there was the fire almost a year ago caused by a ruptured pipe in a desulfurization unit that released vapors.  Fortunately, no one was injured.

25

After a five-month inspection, OSHA cited BP for 14 serious safety violations and levied $63,000 in fines.

In announcing the fines, Charles Williams, OSHA's Houston South area director, chided the company for allowing hazardous conditions to develop. "OSHA will not tolerate this disregard for worker protection," he said.

Now, it seems, OSHA will.

* * *

The proof of BP's lack of penance can be found in the internal memo, posted on the Chronicle's Web site, that shows the company's own investigators found a lack of adequate training and poor judgment led to the two deaths in September.

75.    In the aftermath of the Texas City explosion, several lawsuits on behalf of injured workers were filed against BP. The lawsuits allege numerous violations by BP. On May 5, 2005, the <u>Houston Chronicle</u> reported that:

The deadly blast at the BP Texas City refinery was caused partly by understaffing in a critical control room, and other workers on duty in the area that exploded were either inexperienced, undertrained or not adequately doing their jobs, plaintiffs in a lawsuit against the company alleged Wednesday.

In an amended lawsuit raising new, specific allegations against BP, two injured workers painted a grim picture of staffing and supervisory problems they say played a key role in the accident.

The supervisor of the refinery's isomerization unit, which was being restarted at the time of the blast, wasn't even at the unit "during a critical time period" during the start-up, the lawsuit alleges. It also claims that a qualified substitute was not left in charge, other key operators were allowed to leave the refinery at the time and only one board operator was assigned to the control room.

BP spokesman Hugh Depland declined to comment on the new allegations, saying they were not facts, but claims in a lawsuit. The company has denied negligence in the blast.

* * *

"Our continued investigation leads us to believe that there was a systematic breakdown in communications, in operator training and in management

26

supervision of the start-up procedures," said Houston lawyer Rob Ammons, who filed the undated lawsuit on behalf of injured workers Miguel Arenazas and David Crow.

76.     Ultimately, BP admits blame for the Texas disaster.  On May 18, 2005, The

Guardian (London), reported:

> BP fired some staff and disciplined others yesterday after admitting that "deeply disturbing" internal mistakes led to the Texas City refinery explosion which killed 15 people and injured 170.

> The decision to accept full and quick responsibility for the disaster brought plaudits from the industry experts, who described the move as "very brave" in a world where companies fear heavy legal suits.

> An interim report by BP executives concluded the fire on March 23 at the American facility occurred primarily because its own employees overfilled and then overheated a crucial piece of oil processing equipment.

> "The mistakes made during the start-up of this unit were surprising and deeply disturbing.  The result was an extraordinary tragedy we didn't foresee," said Ross Pillari, president of BP Products North America.  "The failure of Isom (isomerisation) unit managers to provide appropriate leadership and the failure of hourly workers to follow written procedures are among the root causes of this incident," he added.

> The company is to take disciplinary action against "several" supervisory and hourly employees directly responsible for the Isom part of Texas City but no names or specific numbers were given by BP's head office in London.

> "These actions, which begin today, will range from warnings to termination of employment.  As the investigation continues, and as new information is discovered others also may be disciplined," said Mr. Pillari.

* * *

> The oil major said it would try to provide financial support and compensation, which could circumvent the need for lawsuits or lengthy court proceedings.  BP has also agreed to take responsibility for compensating the families of the deceased and injured employees working for three of its contractors.

77.     On June 29, 2005, <u>The Guardian (London)</u>, reported that a U.S. safety regulator

has blamed the explosion on an alarm malfunction.  According to the article:

> In an interim report published yesterday, the Chemical Safety and Hazard
> Investigation Board (CSB) said high-level alarms at BP's Texas City plant did
> eventually sound but only after the explosions had begun.
>
> "Had the alarms sounded properly as the blowdown drum was flooding, it could
> have alerted operators to the emergency situation," said the board which
> investigates industrial accidents but does not issue penalties.
>
> The CSB is continuing its inquiry into the explosion at the nation's fourth largest
> refinery and has requested maintenance records for the alarms and related
> equipment.
>
> * * *
>
> BP said that it was checking the maintenance records of the alarm equipment but
> was also concerned to see whether the alarms were affected by problems in a
> crucial piece of oil processing equipment.
>
> BP said last month that its own employees overfilled and overheated a key piece
> of refining plant.  It fired staff and disciplined others after admitting "deeply
> disturbing" internal mistakes led to the blast.
>
> Last week lawyers said BP had negotiated "extremely big" settlements with
> families of workers killed in the March 23 explosion.  The oil company said that
> talks with families and victims of the blast were under way, but declined to be
> specific about discussions.

78.     As the investigation into the explosion continued, additional reports of safety

violations at BP's Texas City facility continued to surface.  According to an August 7, 2005

article in the <u>Houston Chronicle</u>, the Texas City refinery "was the site of repeated malfunctions

that could have been prevented if BP correctly and more frequently performed maintenance on

the unit."  The article further reported:

> In one case, the Texas Commission of Environmental Quality warned BP that a
> mishap on the unit in May 2004 - which did not register as an environmental
> incident - was a "major event" that "could have been more severe."

28

Five months later, in October 2004, a faulty valve caused a release of pollution, and the state concluded that, "A scheduled startup, shutdown, or maintenance should have identified and repaired the malfunctioning relief valve.  This may have eliminated the potential for this incident."

The blast July 28, which caused no injuries, also occurred because of a mistake during the maintenance, BP said last week.  Contractors installed pipe in the wrong place on the unit, causing a rupture that released flammable hydrogen gas.  Follow-up inspections failed to detect that the pipe was the wrong one and had cracked.

'High number of incidents'

A review of all incidents at BP's Texas City refinery in 2004 by the Chronicle shows that 22 occurred on the socalled Resid Hydrotreating Unit, where sulfur is removed from heavy crude oil.  That's more incidents than at any of the other 30 units on the 1,200- acre plant site that year.

The entire facility, one of the largest refineries in the United States, registered 116 so-called upsets - unplanned bursts of pollution released in a short period.  That's more than any other facility in the Houston area.

"If you are comparing them to other facilities in Texas City, they do have a high number of incidents," said Ronnie Schultz, director of environmental health programs for the Galveston County Health District, which investigates pollution complaints in the area.

79.     Shortly thereafter, The Independent (London), on August 18, 2005, reported that

BP agreed to "set up an independent panel of experts to investigate safety procedures at its five

refineries after America's chemical watchdog issued a damning report on the explosion at its

Texas City site."  As reported by the article:

'Systemic lapses in organisational decision-making, safety oversight and safety culture' at the Texas City site contributed to the huge blast, the US Chemical Safety and Hazard Investigation Board said.

The body said it was issuing the first safety recommendation in its eight-year history, calling on BP to set up a body similar to the one which investigated the 2003 destruction of the Columbia space shuttle.

Carolyn Merritt, the chairwoman of the investigation board, said BP should 'immediately convene an independent panel of experts of examine BP's corporate safety management systems, safety culture and corporate oversight of its refineries.  The panel should report its findings and recommendations to the BP workforce and the public.'

BP responded promptly by confirming that it would set up such a body, which will be chaired by someone independent of the company and include members of its workforce.

Lord Browne, the chief executive of Britain's largest oil company, said: 'The Texas City explosion was the worst tragedy in the recent history of BP, and we will do everything possible to ensure that nothing like it happens again.  We will move speedily to appoint an independent panel and offer it every help to do its job.'

BP responded quickly to the huge explosion, offering to improve safety procedures at Texas City, which is the oil giant's largest refinery, and to pay compensation to victims and their families.  It has since attracted criticism for blaming mistakes by its workers in its own report into the tragedy in May.  Several victims' families have started legal proceedings against BP.

80.     Similarly, on August 18, 2005, the <u>Houston Chronicle</u> reported that the explosion

could have been prevented.  According to the article:

CSB officials have said in previous briefings that those deaths may have been prevented if the blowdown stack had been equipped with a flare, which may have safely burned away the excess liquids and vapors.

Investigators also have found that a key level indicator and high-level alarms in the splitter either malfunctioned or were not working properly, possible confusing operators starting up the unit.

On Wednesday, investigators revealed that BP management knew that the level indicator needed repair, but deferred a March 10 work order until after the start-up.

* * *

Still, the CSB's lead Texas City investigator said Wednesday that the March incident, two others on July 28 and Aug. 10, and others in years past appear to show a troublesome pattern of dangerous mechanical failures at the plant.  Don

Holmstrom called those incidents "missed opportunities" by management to adequately deal with them.

Holmstrom noted that in the majority of 17 previous start-ups of the raffinate splitter between April 2000 and March 2005, abnormally high pressures and abnormally high liquid levels were recorded.  The company did not investigate those as near-misses, nor did it change the design of the unit in the wake of those abnormalities, the CSB said.

* * *

"An explosion with the loss of life is a significant event from a regulatory and law enforcement standpoint," the former official said.  "I imagine that this report will do nothing but add to the urgency of those agencies looking at this."

81.     More disturbing news concerning the Texas City explosion continued to be reported by the press.  On September 9, 2005, the <u>Houston Chronicle</u> reported that BP kept running a unit even though its pipes were eroding.  As stated by the article:

BP Texas City refinery managers in May knowingly kept running a unit with thinning and eroding pipes - which they considered a serious safety risk - just two months after a blast at another unit killed 15 people, according to an internal BP e-mail the Houston Chronicle obtained.

If pipes within a refinery become too thin the erosion is severe, they can quickly fail and lead to fires and explosions.

The Occupational Safety and Health Administration confirmed it is investigating the recent operations of the refinery's Ultraformer No. 4 unit, said spokeswoman Elizabeth Todd.

It isn't the first time OSHA has investigated that unit.  In March 2004, a ruptured pipe in that same unit, which produces blending components used to boost the octane of gasoline, caused a series of explosions and fires.  An OSHA investigation found 14 serious violations and led to a $63,000 fine.

Among the violations was that "the employer did not inspect and test areas of high corrosion concern," according to records obtained by the Chronicle.

According to a copy of an e-mail sent May 27 of this year by the head of that unit - called the UU4 - thin piping and at least one crack were discovered during inspections.  But managers decided to continue operating in anyway.

* * *

"The piping is a serious safety risk," wrote superintendent Ross Vail to other unit superintendents and BP top management.  "However UU4 will remain operating until UU3 has returned to safe operation.  ...  The decision to operate UU4 was not easy, but the risk to the site was very apparent."

82.     On September 23, 2005, the Occupational Safety and Health Administration "fined BP a record $21.3 million and charged the company with 300 health and safety violations in the March explosion at its Texas City refinery that killed 15 people.  As reported by the Houston Chronicle on September 23, 2005, "OSHA issued willful and serious violations against BP for":

Operating unsafe electrical equipment.

Failure to correct deficiencies in the blowdown drum stack and other equipment

Failure to adequately evaluate the safety impact of a catastrophic blast for temporary trailers located near the isomerization unit

Failure to evaluate alarms and instruments for design reliability

Failure to make sure operators followed start-up procedures

Failure to warn employees of the developing explosion

Failure to inform contractors prior to the start-up

Failure of emergency responders to don respiratory protection

Failure to monitor for asbestos following explosion

83.     The repercussions of the Texas City explosion continue to adversely impact BP. Along with the penalties imposed by OSHA, the Company announced that BP's own internal audit discovered "big lapses in management."  On November 24, 2005, the Houston Chronicle reported that:

An internal BP audit that the company refused to make public for the last several months found widespread management and safety problems at its Texas City refinery in the wake of an explosion that killed 15 workers.

The June audit, ordered by BP after the March blast and released by the company Wednesday, discovered major lapses in leadership, risk awareness, compliance with safety policies and workplace conditions.

The scathing review was particularly surprising because 10 of the 17 audit team members were high-level managers of other BP refineries or corporate headquarters.

* * *

Specifically, the June audit identified roughly 50 issues that the Texas City refinery's managers needed to address.  Among them:

Plant leadership was not "connecting to the work force in a meaningful way."

While refinery procedures appeared sound, there was "inconsistent compliance" with them refinery-wide.

There was a general lack of awareness of risk.

Managers and superintendents are rotated out of their jobs so often that they sometimes never develop a deep understanding of the units they are overseeing.

Control rooms, likened to the cockpits of airplanes, are distracting, even containing television sets for board operators to watch while they're supposed to be overseeing process units.

There was a "deep-seated lack of respect for contractors" throughout the refinery, including violations of diversity and inclusion policies.

While unit upsets and accidents are recorded, there was little analysis to determine safety trends or patterns.

There was a pervasive lack of accountability among workers and managers.

84.    In fact, as reported by The New York Times on December 10, 2005, "The Labor

Department asked federal prosecutors to consider bringing criminal charges in an explosion that

killed 15 employees and injured more than 170 at a BP refinery in Texas City, near Houston, on

March 23.  In September, the Company acknowledged 300 'willful' violations of Occupational

Safety and Health Administration standards and agreed to a $21 million civil penalty."

     85.     Questions regarding the safety at the Texas City refinery and how much BP

leaders knew continued into the spring of 2006.  On April 17, 2006, the <u>Financial Times</u>

reported:

> In late 2004, Don Parus, site manager at BP's biggest refinery, realised something was terribly wrong.
>
> The site had suffered 22 fatalities over 30 years, its safety business plan for 2005 noted there was a key risk of death of a worker in 12-18 months, and a BP safety presentation opened with the words: "Texas City is not a safe place to work."
>
> He commissioned a safety audit by the Telos Group, a Texas-based consultancy, which surveyed more than 1,100 employees, roughly 60 percent of the current workforce, and interviewed over 100.
>
> The 338-page report, a copy of which has been obtained by the Financial Times, reveals a safety culture that make many fear working in the facility.
>
> "The history of investment neglect, coupled with the BP culture of lack of leadership accountability from frequent management changes, is setting BP Texas City up for a series of catastrophic events," is just one comment in the audit.
>
> The report was finalised on January 21, 2005.  Two months later, the accident predicted by several in the audit arrived: an explosion killed 15 people and injured an estimated 500 in the deadliest refinery accident in ore than a decade. Four months later, the site suffered another explosion.
>
> It is unclear how much BP's leadership knew about site safety.  Several in the audit said they were bullied about accidents so much that many went unreported. A risk identified in BP's 2005 safety business plan, seen by the FT, was that the site would not report all incidents for "fear of consequences."
>
>                 * * *
>
> That said, an investigation of the accident by the US Chemical Safety and Hazard Investigation Board (CSB), an independent federal agency that investigates industrial chemical accidents, revealed BP decided against upgrading equipment that might have prevented the accident; operated with malfunctioning equipment;

and had worked staff 30 days straight in 12-hour shifts, before the accident.  It questioned the training and experience of key staff.

"In a corporation with a good safety culture, near-miss reporting is actively encouraged and corrective steps are put in place before disaster strikes," said Carolyn W. Merritt, chairwoman of the CSB.  "The CSB was concerned enough about what we saw in Texas City to recommend an examination through BP North America."

BP has undertaken the examination and shut the refinery for a Dollars 1bn repair programme.  The Department of Labor uncovered over 300 violations and settled with BP, which did not admit fault, but agreed to improve processes and pay a maximum Dollars 21m fine.

The Department of Labor has referred the case to the Department of Justice to review for "criminal action."

"Even if the lapses at the Texas City refinery were an aberration, where was the corporate oversight to bring that facility into line?"  Ms. Merritt asked.  "BP needs to make certain that it has effective safety systems, maintenance resources, staffing, and auditing in place to prevent major safety or environmental incidents."

BP has settled all but two of the fatality cases but is embroiled in hundreds of lawsuits with those injured inside and outside the refinery.

"When they got the Telos report, BP had a choice: Embrace safety and do it the right way, or just keep profits and production going," said John Eddie Williams Jr., managing partner at Williams Bailey, which is handling 145 cases.  "They made the conscious decision to keep running this plant instead of doing a safety stand-down."

He is to take a deposition from John Browne, BP's chief executive, next month to discovery whether he knew the refinery had been so unsafe for so long.

86.    BP's problems regarding the Texas City explosion continue.  In recent weeks --

BP's safety record regarding its Texas City facility continues to come under attack.  As reported

by The Independent (London) on October 16, 2006:

BP's safety record in the US has come under renewed attack in a damning official report into a fire at its Texas City refinery which happened just four months after an explosion at the same plant killed 15 workers.

The US Chemical Safety and Hazard Investigation Board (CSB), an independent federal agency whose members are appointed by the President, concluded yesterday that they incident could have been avoided had BP followed simple safety procedures and briefed contractors properly.

The fire occurred after a piece of piping failed catastrophically and without warning, releasing a fireball of flammable hydrogen gas.  The resulting blaze took two hours to bring under control.  Although no one was serious injured, the fire in July last year caused an estimated $30m-worth of damage and led an urgent recommendation from the CSB for BP to reexamine the safety culture at its US refineries.  The unit where the fire occurred is still closed 15 months later.

Investigators from the CSB discovered the fire was caused after a steel piping elbow was put back in the wrong place during a routine maintenance shutdown five months earlier.

The contractor had inadvertently switched the positions of an alloy steel elbow with a carbon steel elbow which was not able to withstand continuous exposure to high-temperature hydrogen gas.  BP had not informed the maintenance contractor that the two apparently identical elbows were not interchangeable.  Nor did it have a simple X-ray testing system in place for critical components which would have alerted the contractor to the potentially fatal error.

"The test is simple to perform and differentiates between carbon steel and alloy steel," the CSB report says.  The board's lead investigator, John Vorderbrueggen, said had the test device been in use then the accident would not have occurred.

* * *

The incident was one of the several at the huge refinery which led to the CSB making its urgent recommendation for BP to overhaul its safety culture and oversight.  The chairman of CSB, Carolyn Merritt, said: "BP has recognised that there is an unhealthy safety culture at this facility that contributed to these accidents."

The board is due to complete its investigation into the devastating Texas City explosion four months earlier which killed 15 employees and injured more than 170.

A US district court judge last week ordered BP's chief executive, Lord Browne of Madingley, to give testimony in a compensation case being brought by the daughter of two of the victims.  BP has set aside $1.2bn to cover claims and has already settled nearly 1,000 cases.

BP was caused further embarrassment last week when it emerged that John Manzoni, its head of refining and marketing, had written an e-mail saying he had been obliged to give up a "precious" day of his holiday to visit the refinery after the accident.  Mr. Manzoni was made to read out the e-mail as part of his deposition to the US court.  After the Texas City explosion in March last year a BP executive was appointed to conduct a review of the company's safety approach.  John Mogford was given the new role of vice president of safety and operations in May 2005.  He has a staff of 45 and another 45 auditors.

87.     On October 24, 2006, along with announcing a decline in profits of 3.6%, BP also announced that it was setting aside an additional $400 million to resolve legal disputes stemming from the Texas City disaster, bringing the total bill to around $2 billion.

88.     Similarly, on October 30, 2006, The Wall Street Journal online edition reported that federal investigators concluded that the Company was aware of "significant" safety problems at the refinery and 34 other locations.  According to the article:

Carolyn Merritt, chairman of the U.S. Chemical Safety and Hazard Investigation Board, said the board's investigation "shows that BP's global management was aware of problems with maintenance, spending, and infrastructure well before March 2005."

* * *

BP's Texas City refinery relied upon outdated equipment, already phased out in most refineries and chemical plants, Ms. Merrill said.

The preliminary findings show that the unit primarily responsible for the blast and eight previous instances where flammable vapors were released in the 10 years prior to the accident.  The report said any of those releases could have resulted in a deadly accident like the 2005 blast, which was the worst accident in the industry in 15 years.

"The eight incidents were not properly investigated, and appropriate corrective actions were not implemented," the CSB report said.  The investigation of a 1994 incident requested that a supervisor analyze the adequacy of the equipment.  The analysis was not completed, and management never followed up, according to the CSB.

37

In addition to the CSB's review, the company currently faces an investigation by
the U.S. Environmental Protection Agency and Department of Justice, which are
looking into a potential criminal case related to the Texas City explosion.
Following a recommendation from the CSB, an independent commission is also
reviewing operations at BP's five refineries in the continental U.S.

89.     On October 31, 2006, certain findings by the CSB were reported by the press.

According to the Houston Chronicle, BP had engaged in "widespread budget cuts at the

Company's Texas City refinery and other plants worldwide in recent years, even though they

were well aware of serious safety problems throughout the facilities, federal investigators said

Monday."  According to the article:

Those cuts, as well as shortsighted safety improvements, were major factors in the
fatal March 2005 blast at the Texas City site, where 15 people were killed and
scores injured in a explosion investigators have deemed preventable, the
investigators said in a release of preliminary findings.

"What they forgot in years of cost-cutting and employee cuts is that something
very bad could happen," Carolyn Merritt, chairman fo the U.S. Chemical Safety
and Hazard Investigation Board, told the Houston Chronicle.

* * *

Specifically, the safety board said Monday that:

•A 2004 BP audit of 35 business units including Texas City, found "widespread
tolerance of noncompliance with basic safety rules and poor implementation of
safety management systems and processes."

•BP implemented a 25 percent company-wide cut on fixed costs between 1998
and 2000, negatively impacting spending for maintenance repairs and other safety
improvements.

•The training staff in Texas City was reduced from 30 people in 1997 to eight in
2004, and the budget was cut in half during that time.
Chappell said the company's own final accident investigation report disputed that
spending cuts were a "critical factor" in the March 2005 accident.

**BP's Propane, Crude Oil and Gasoline Market Manipulation Scheme**

90.     In further disregard of industry standards and norms, BP is currently under

criminal investigation by the U.S. Justice Department as well as a companion civil case filed by

the Commodity Futures Trading Commission ("CFTC") for trying to manipulate the propane

market in April 2003 and then again in February 2004.  These actions caused unnatural spikes in

the price of propane, leaving millions of Americans with higher heating bills.  As first reported

by The New York Times on June 28, 2006:

> "With the knowledge, advice, and consent of senior management, BP employees
> developed and executed a speculative trading strategy in which BP cornered the
> February 2004 ... physical propane market," the commodity Futures Trading
> Commission alleged in a 42-page complaint filed in a U.S. district court in
> Illinois.

91.     Indeed, BP is the largest supplier of propane in North America, a fuel typically

used for heating in rural areas that do not have access to other forms of fuel distribution systems.

About seven million U.S. households depend on propane as their primary heating fuel.  As such,

any price fluctuations have an immediate and terrible impact on those customers relying on

propane for their energy needs.  As Gregory Mocek, the CFTC's enforcement director put it:

> Cornering a commodity market is more than a threat to market integrity.  It is an
> illegal activity that could have repercussions for commercial market participants
> as well as retail consumers around this country.

92.     The BP Traders attempted to corner the propane market by buying up a dominant

share of available propane so that they could control its prices when suppliers came to purchase.

As BP bought more propane, the prices surged from 68 cents a gallon to as high as 91 cents a

gallon in February 2004.  According to the Justice Department's complaint, the BP Traders

committed to buy more propane than existed in a pipeline that supplies much of the Midwest and

Northeast.  As explained on June 29, 2006 in USA Today:

> The BP traders' intent, the CFTC says, was to "squeeze" speculators who entered
> into propane sales agreements expecting the price to fall by month's end, when
> they would be obligated to physically deliver the product.  The CFTC says the BP
> traders believed they could turn a $20 million profit by artificially driving up the
> price of a commodity they controlled.

> "What we stand to gain is not just we'd make money out of it, but we would know
> from thereafter that we can control the market at will," said former BP trading
> manager Mark Radley, in a Feb. 5, 2004, recorded conversation and the CFTC
> cited in its complaint.

93.     This scheme was first tested out in a "trial run" in April 2003.  At that time, Mark

Radley, trading manager of NAGP, directed his staff to buy up all the available propane in the

market in order to corner the market and drive up prices.  Phone conversations between Radley

and his traders plotting were recorded and later obtained by the Justice Department.  As

catalogued by The Daily Telegraph (London), in an article on June 30, 2006, there were at least

four different damning conversations recorded:

> The first conversation was recorded on April 2, 2003 when the complaint claims
> Radley, along with his number two, Dennis Abbott, and trader Cody Claborn,
> discussed the position.

> **Abbott:**  "How does it feel taking on the whole market, man?"  Claborn: "Whew.
> It's pretty big man."

> **Abbott:**  "Dude, you're the entire [expletive] propane market!"  Abbott goes on
> to express some concerns but they are brushed aside by Radley.

> **Radley:**  "Don't worry about it, it's the first two days of the month.  Plenty of
> lead time for people to think that barrels will emerge and take a short position."

> **Abbott:**  "No, it's cool.  I dig it, it just, sometimes it's hard, it just feels hard to
> take on the whole market sometimes."

At one point, Radley appears to acknowledge the risks of the strategy: "Here's my one fear and it's a significant fear.  Everybody waits until the last [expletive] day to cover and then we get wound up in a [expletive] bunch of legal disputes.  That's my fear."

94.     On February 5, 2004, there was a second taped conversation between Radley and

Abbott.  As further described in the article:

> According to the complaint, Radley had already described the April 2003 strategy as a "trial run".  Now, the US authorities claim the BP traders were forced to take steps to get out of what could have been a potentially losing position.  It is claimed that throughout January, BP had been building a long position in propane.  At the time, Radley was taped allegedly stating his belief that the market was vulnerable to manipulation.
>
> On January 8, it is claimed he was recorded saying the market was "vulnerable to a squeeze" and just a week later, he is alleged to have described the market as "tight enough that if someone wanted to play games with it, potentially they could".
>
> However, the complaint says that while BP was building its position in propane, foreign imports were driving the price down, potentially resulting in a losing position.  As a result, US authorities claim a strategy began to be formed.
>
> On February 5, what is said to be the initial planning of the scheme was caught in a taped conversation between Radley and his number two Dennis Abbot.
>
> **Radley:**  "Two things I thought of.  One, in terms of whether we should do this or not, in terms of talking to Jim [Summers - Radley's boss] what we stand to gain is not just we'd make money out of it, but we would know from thereafter that we can control the market at will.  If we never break the threshold, we'll never know what the answer is, you know what I mean?"
>
> **Abbott:**  "Yeah, if you go for it, you'll know 'OK, wait a minute, this market is way too big and we could never ever do this'."
>
> **Radley:**  "and we'll never try it again."
>
> **Abbott:**  "We'll never try it again.  Yeah, there's a certain, you know, I kind of scoff at about, you know, you know things or will learn something from it.  But you do.  I mean there's value in that knowledge."
>
> **Radley:** "Absolutely."

41

**Abbot:**   "There's a lot of value in that knowledge."

After the conversation, internal BP documents summed up the strategy thus: "In February 2004, the NGL's trading bench entered into a strategy to create a long February-March spread.  The bench planned on holding a large portion of existing TET Mont Belvieu propane inventory.  It was believed that the resulting lack of supply at TET would drive up prompt prices, further widening the spread.  The bench would then liquidate its inventory at higher prompt prices before the end of February."

95.    All the planning caught thus far on tape was in preparation for what is documented in the last conversation recorded between Radley, Abbott and Claborn at BP's Houston trading desk.  The scheme was put into effect on February 9, 2006, when the following conversation took place, as further stated in the June 30, 2006 Daily Telegraph article:

It started on February 9, when Claborn, in another taped conversation with Radley, allegedly said he bought 300,000 barrels of propane "very quietly".  When Abbott joined the call the complaint contends that he admitted "I was kinda surprised we were able to get 300 from the marketplace, basically, maybe 3-400 from the market place without moving it that much.  I mean we were definitely moving it at the end of the day."

He goes on: "I mean tomorrow, tomorrow if we are able to buy another 4-500 thousand barrels tomorrow from the marketplace, I would be really shocked... Then I think we'll just have to play a waiting game and see, you know, how it's gonna shape up."

The tape appears to show that Radley is satisfied, but again expresses concern about what could happen when people take notice at the end of the month: "Good, Good.  Sounds pretty good.  Well something's got to give.  Half of me is saying look, the fact that nothing's really moved in terms of the spread yet is good, because people aren't looking for ways out.  The downside is of course if it all happens at the last minute it gets a bit messy.  People start cheating, not delivering and may start to look a little bit funny as well that the spread, you know, just erupts at the last minute."  Forgetting the ban on the certain words he allegedly concludes: "If we squeeze it in the last four or five days of the months, ahhh, forgive my French, but ah, you know its going to be hard to say what's the fair price of the market at the time."

96.     Abbott had another conversation with an unnamed market trader recorded on

February 18 simply confirming the scheme that had been put into play:

> **Participant:**  "Jeez, what is y'all's appetite for propane?  I mean, it's just like
> feeding an elephant. You guys aren't really short though, are you?  You just got
> stuff pricing out?  You're short pricing or what?"
>
> **Abbott:**  "Un, yeah, we just like it."
>
> **Participant:**  "You dig it, huh?"
>
> **Abbott:**  "I'd call...  I'd call it insatiable right now."

97.     In addition, the CFTC complaint recounts an instant message conversation

between two unidentified traders regarding the BP "squeeze" play:

> **Participant 1:**  "Is this just an amazing short squeeze for Feb TET... Or is
> something else miraculous going on?"
>
> **Participant 2:**  "It's BP - trying to squeeze - but the weather is not cooperating."

98.     This scheme was not hatched solely by the BP Traders, but rather it was done

with the full knowledge and approval of senior executives at BP.  As stated by the Justice

Department prosecutors in the propane trading case, "Abbott admitted that he understood that the

scheme was approved by senior executives at BP."  Also, <u>The Daily Telegraph (London)</u>

reported that there was a conversation between Radley and his boss, as well as the compliance

manager at the Houston trading desk, in which Radley was seeking, and ultimately received,

approval for his scheme:

> Prior to the [February 9, 2006] conversation, Radley met with his boss, Jim Summers,
> and with compliance manager Martin Marz.  US authorities contend this was to obtain
> approval for the strategy.  It was granted, although Marz is alleged to have cautioned
> traders from using certain words in relation to the deals.  One of them was "squeeze."

99.     This is not the first time that BP has come under scrutiny for its aggressive

trading tactics.  At a Senate hearing in 2002 on this very topic, Ross Pillari, then chief of BP

America, testified regarding similar practices that had occurred at BP's crude oil trading desk.

At issue was a "brainstorming document" that BP analysts had created in 1999.  In it, the

strategists discussed "significant opportunities to influence the crude (oil) supply/demand

imbalance" in the US Midwest.  At that time, Mr. Pillari agreed that such strategies were

"unacceptable and inappropriate."  Unfortunately, those exact strategies were utilized in April

2003, a mere year after Mr. Pillari disavowed them to the US Senate, and again in 2004, to

manipulate the propane market in the US Midwest and Northeast.

100.    Despite all their previous troubles with manipulating energy markets, including

paying a $2.5 million fine by the New York Mercantile Exchange in September 2003 to resolve

allegations of crude oil trading violations in 2001 and 2002, BP executives and management just

couldn't stop.  First, the US Senate is investigating whether BP's decision to, at first, halt all

Prudhoe Bay oil field production of about 400,000 barrels a day, in response to the corrosion

problem, was an attempt to manipulate the oil market.  At that time, prices immediately rose

when news of the closure got out by more than $2.20 a barrel, as fears abounded that the US

would lose eight percent of its oil producing capacity for weeks or months, in an already tight oil

market.

101.    Next, on August 29, 2006, The Wall Street Journal reported in an article entitled

"BP Woes Deepen With New Probe," that BP is being investigated for possible manipulation of

crude oil and gasoline prices by both the CFTC and the Justice Department:

44

Federal investigators are examining whether BP PLC manipulated crude-oil and unleaded-gasoline markets, signaling a rise in regulatory scrutiny of the British energy giant, said lawyers and traders close to the case.

* * *

The commodity Futures Trading Commission has sent subpoenas to BP and energy traders in the crude-oil probe, which is focused on possible manipulation of the global over-the-counter market in 2003 and 2004, according to lawyers and traders who have been contacted or briefed in the civil investigation.  (The over-the-counter market includes trades conducted over the phone or electronically in products not listed on exchanges, or in marketplaces that regulators can't see.)

The separate gasoline inquiry, which has been under way more than a year and includes a criminal probe by the Justice Department, is examining a single day's trading on the New York Mercantile Exchange in 2002, the lawyers and traders close to the case said.

A spokesman for BP in the United Kingdom said, "We are aware of investigations being done by the [U.S.] authorities and we are cooperating fully."  He didn't elaborate on the nature of the investigation.  People at other firms said many trading firms had received CFTC demands for information, suggesting that the investigation went beyond BP.

A CFTC spokesman declined to comment, saying the agency doesn't confirm or deny investigations.  A Justice Department spokesman also declined to comment.

In the broader civil investigation into crude-oil trading, investigators are examining, among other things, whether BP used information about its own pipelines and storage tanks at a key oil-delivery point in Cushing, Okla., to influence crude-oil price benchmarks that are set each day and influence billions of dollars of transactions.  It isn't related to the propane case, in which civil claims by the CFTC are pending against BP in federal court in Chicago, as well as a criminal charge against a former BP trader in U.S. District Court in Washington; numerous civil lawsuits seeking damages are also pending.  BP has denied wrongdoing in the propane case.

## DERIVATIVE ALLEGATIONS

102.     Plaintiffs bring this complaint derivatively in the right and for the benefit of BP to

redress injuries suffered and to be suffered by BP as a direct result of the violations of fiduciary,

common law and civil law, duties by the defendants.  This is not a collusive action to confer

jurisdiction on this Court that it would not otherwise have.

103.    Plaintiffs will adequately and fairly represent the interests of BP and its

shareholders in enforcing and prosecuting their rights.

104.    Plaintiffs have not made any demand on the Board of Directors of BP to

institute this action because such demand would be a futile and useless act for the following

reasons:

> (i)    The acts complained of herein constitute violations of fiduciary, common law and civil law, duties owed by BP's Board of Directors and these wrongful acts are incapable of ratification;
>
> (ii)   The Board has failed to commence any action against the principal wrongdoers despite the significant passage of time since the malfeasance came to light;
>
> (iii)  The acts complained of herein are illegal and unreasonable and thus are acts incapable of ratification;
>
> (iv)   In order to bring this action for breach of fiduciary, common law and civil law duties, the members of the BP Board of Directors will be required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, with whom they are well acquainted and with whom they have entangling alliances, interests, and dependencies, which they will not do.  They therefore will not be able to vigorously prosecute any such actions.  These entangling alliances include defendants Browne and Bryan both presently sit on the board of Goldman Sachs Group Inc; defendants Julius and McKillop served together as directors of Lloyds TSB Group PLC; defendants Sutherland and McKillop both presently are directors of The Royal Bank of Scotland Group; and directors Massey, Davis, and Bryan served together as directors of Amoco;
>
> (v)    BP is currently under criminal investigation by the EPA in connection with the March 2nd 2006 oil spill along the oil transit lines servicing the Prudhoe Bay oil facility.  The August 2006 Prudhoe Bay shutdown has led to a pending investigations by numerous governmental agencies, including the Alaska Attorney General, David Marquez, with possible criminal and civil sanctions.  BP is also currently under investigation by various

governmental regulatory agencies in connection with the explosion at its refinery in Texas City, as well as the improper trading by BP Traders. It is inimical for the Board to commence action against the principal wrongdoers in light of the pending criminal and civil investigations, for to do so would further expose and bolster the allegations asserted in these pending investigations;

(vi)     BP is a defendant in civil litigation in Texas, making it impossible for the Board to assert the allegations made herein; and

(vii)    The members of the BP Board of Directors, including each of the defendants herein, receive substantial benefits, and other emoluments by virtue of their membership on the Board and their control of BP. Bringing an action or even adequately investigating other directors, who have the power to terminate an inside director's employment, would not occur. The defendants are incapable of exercising independent objective judgment in deciding whether to bring this action.

## COUNT I

### (Breach of Fiduciary Duties)

105.    Plaintiffs incorporate by reference and reallege each and every allegation as set forth above as if fully set forth herein.

106.    Each defendant owed BP and its shareholders the highest duties of loyalty, honesty, candor and care in conducting their affairs.

107.    At a minimum, to discharge these duties, each defendant should have exercised reasonable and prudent supervision over the management, policies, practices, controls and affairs of BP. By virtue of these obligations, each defendant was required, inter alia:

a.      to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of BP;

b.      to be and remain informed as to how BP was operating and,

upon receiving notice or information of an imprudent, questionable, or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and

       c.    to conduct the affairs of BP to provide the highest quality services and maximize the profitability of the Company for the benefit of its shareholders.

108.    The defendants also each owed a duty to BP to test, oversee and monitor their systems of internal controls and corporate governance procedures and to ensure that they were functioning in an effective manner and in compliance with federal and state statutes and regulations, including but not limited to the Sarbanes-Oxley Act.  Pursuant to Sarbanes-Oxley, the defendants are required to reimburse BP for the bonuses and other incentive-based and equity-based compensation received by them from BP during the relevant time period.

109.    Independent of Sarbanes-Oxley, such defendants should be required to disgorge any and all gains unjustly obtained at the expense of BP and its shareholders by way of their fraudulent conduct and breach of their fiduciary duties.

110.    Accordingly, plaintiffs seek on behalf of BP monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT II

### (Waste of Corporate Assets)

111.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

112.    The defendants knowingly, intentionally, recklessly or negligently breached their fiduciary duties and, thereby, caused the Company to waste its assets, expend billions of dollars

48

of corporate funds, and impair its formerly sterling reputation and credibility for no legitimate business purpose, as a result of which BP has been and continues to be substantially damaged.

113.    Defendants have bestowed upon themselves grossly excessive compensation which have no reasonable or legitimate basis, especially due to their woeful leadership, control and supervision over the Company, management, policies, practices, controls and  affairs which has brought it to this state.

## COUNT III

### (Indemnification)

114.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

115.    As alleged herein, the defendants, acting as officers and/or directors of BP and, therefore, as its agents, breached their fiduciary, common law and civil law duties to BP and its shareholders.

116.    BP has suffered significant and substantial injury as a direct result of the defendants' knowing, intentional, or reckless breaches of their fiduciary, common law and civil law duties as alleged herein.  Plaintiffs, on behalf of the Company, seek relief from the defendants on the theory of indemnity to the extent that BP is found liable for the defendants' violations of their fiduciary duties.

**WHEREFORE**, plaintiffs pray for judgment as follows:

A.    Declaring that the defendants have breached their fiduciary, common law and civil law duties as alleged herein;

B.     Directing defendants, jointly and severally, to account for all losses and/or damages sustained by BP by reason of the acts and omissions complained of herein;

C.     Requiring defendants to remit to BP all of their salaries and other compensation received for the periods when they breached their duties;

D.     Ordering that defendants and those under their supervision and control refrain from further violations as are alleged herein and to implement corrective measures including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of herein which will rectify all such wrongs as have been committed, prevent their recurrence and ensure compliance with the Sarbanes-Oxley Act;

E.     Awarding pre-judgment and post-judgment interest as allowed by law;

F.     Awarding plaintiffs' attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

G.     Granting such other and further relief as this Court may deem just and proper.

Dated:  November 13, 2006
        New York, New York

                                        **WEISS & LURIE**


                                        /s/ Joseph H. Weiss
                                        Joseph H. Weiss (JW-4534)
                                        David C. Katz (DK-6235)
                                        James E. Tullman (JT-9597)
                                        Jack I. Zwick (JZ-2514)
                                        Julia Sun (JS-4982)
                                        Joshua M. Rubin (JR-5168)
                                        551 Fifth Avenue
                                        New York, New York   10176
                                        (212) 682-3025

**STULL STULL & BRODY**
Jules Brody (JB-9151)
Howard Longman (HL-2489)
Patrick Slyne (PS-1765)
Aaron Brody (AB-5850)
6 East 45th Street
New York, New York   10017
(212) 687-7230

Co-Lead Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of November, 2006, I caused a true and correct copy

of the Amended Complaint to be served via e-mail upon the following counsel:

> John L. Warden, Esq.
> Richard C. Pepperman, II, Esq.
> Sullivan & Cromwell
> 125 Broad Street
> New York, New York   10004
> (212) 558-4000
> wardenj@sullcrom.com
> peppermanr@sullcrom.com

s/ Joseph H. Weiss
Joseph H. Weiss
