**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

IN RE BP p.l.c. DERIVATIVE LITIGATION    )  Case No. 06-cv-6168 (HB)

_____

)
)
)

### PLAINTIFFS' MEMORANDUM IN OPPOSITION
### TO DEFENDANTS' MOTION TO DISMISS
### PLAINTIFFS' SECOND AMENDED DERIVATIVE COMPLAINT

WEISS & LURIE
Joseph H. Weiss (JW-4534)
James E. Tullman (JT-9597)
Jack I. Zwick (JZ-2514)
Julia Sun (JS-4982)
Joshua M. Rubin (JR-5168)
551 Fifth Avenue
New York, New York   10176
(212) 682-3025

STULL STULL & BRODY
Jules Brody (JB-9151)
Howard Longman (HL-2489)
Patrick Slyne (PS-1765)
Aaron Brody (AB-5850)
6 East 45th Street
New York, New York   10017
(212) 687-7230

Co-Lead Counsel for Plaintiffs

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Prudhoe Bay Shutdown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Texas City Explosion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    The Market Manipulation Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    The United States and New York Have the Greatest
          Concern With the Issues Raised in this Litigation . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    The Principles of *Foss v. Harbottle*, Which Defendants
          Rely Upon, Have Been Determined By the UK Itself to be Too
          Rigid and Unfair and are Being Abolished by the Companies Act 2006 . . . . . . 16

    C.    Even if the Court Were to Rule the Law of the United Kingdom
          Applies, Plaintiffs Would Still be Able to Assert a Derivative
          Claim on Behalf of BP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    D.    The Complaint Sufficiently Alleges a Prima Facie
          Case of General Personal Jurisdiction over Defendants . . . . . . . . . . . . . . . . . . 20

    E.    The Complaint Sufficiently Alleges a Prima Facie Case
          of Specific Personal Jurisdiction under New York's
          Long-Arm Statute Over All the Individual Defendants . . . . . . . . . . . . . . . . . . . 23

    F.    The Exercise of Jurisdiction over the Defendants is Constitutional
          Under the Due Process Clause of the Fourteenth Amendment . . . . . . . . . . . . . 25

    G.    New York is the Most Convenient Forum in Which to Litigate
          this Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

          1.    Plaintiffs' Choice of Forum Should be Given the Utmost
                Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

          2.    The Gilbert Private Interest Factors Support Plaintiffs'
                Choice of Forum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

3.    The Gilbert Public Interest Factors Also Support Plaintiffs'
Choice of Forum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ii

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aerotel Ltd. v. Sprint Corp.,*
  100 F. Supp. 2d 189 (S.D.N.Y. 2000) ............................................................... 20

*Asahi Metal Industrial Co. v. Superior Court,*
  480 U.S. 102 (1987) ....................................................................................... 25

*Childs v. Schwind,*
  1995 U.S. Dist. LEXIS 12016 (M.D.N.C. June 12, 1995) ..................................... 23

*City of Sterling Heights Police & Fire Retirement System v. Abbey National, plc,*
  423 F. Supp. 2d 348 (S.D.N.Y. 2006) ............................................................... 15

*DiRienzo v. Phillip Services Corp.,*
  294 F.3d 21 (2d Cir. 2002) ................................................... 28, 30, 33, 34

*Finance One Public Co. v. Lehman Brothers Special Finance, Inc.,*
  414 F.3d 325, 337 (2d Cir. 2005) ................................................................ 2, 12

*Gilstrap v. Radianz Ltd.,*
  443 F. Supp. 2d 474 (S.D.N.Y. 2006) ............................................................... 30

*Goldstein v. Groesbeck,*
  142 F.2d 422 (2d Cir. 1944), cert. denied, 323 U.S. 737 (1944) ......................... 14

*Guidi v. Inter-Continental Hotels Corp.,*
  224 F.3d 142 (2d Cir. 2000) ..................................................................... 30, 34

*Gulf Oil Corp. v. Gilbert,*
  330 U.S. 501 (1947) ..................................................................... 29, 33, 34

*Hausman v. Buckley,*
  299 F.2d 696 (2d Cir. 1963) ........................................................................... 13

*Iragorri v. United Technologies Corp.,*
  274 F.3d 65 (2d Cir. 2001) ............................................... 26, 27, 28, 29

*Itoba Ltd. v. LEP Group PLC,*
  930 F. Supp. 36, 44 (D. Conn. 1996) ............................................................... 30

*Koster v. (American) Lumbermens Mutual Casualty Co.,*
  330 U.S. 518 (1947) ................................................................................ 26, 28

*Koster v. (American) Lumbermens Mutual Casualty Co.,*
 64 F. Supp. 595 (E.D.N.Y. 1946) ........................................................................... 28

*Neewra, Inc. v. Manakh Al Khaleej General Tradin and Contracting Co.,*
 2004 U.S. Dist. LEXIS 13556 (S.D.N.Y. July 20, 2004) .................................... 24

*Norex Petroleum Ltd. v. Access Industrial, Inc.,*
 416 F.3d 146 (2d Cir. 2005) ................................................................................. 26

*Norlin v. Rooney, Pace Inc.,*
 744 F.2d 255 (2d Cir. 1984) ............................................................................ 12, 13

*Ontel Products v. Project Strategies Corp.,*
 899 F. Supp. 1144 (S.D.N.Y. 1995) ..................................................................... 23

*Pension Committee of the University Of Montreal Pension Plan v. Banc of America
 Sec. LLC,*
 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) .............................................. 2, 12, 27

*Piper Aircraft v. Reno,*
 454 U.S. 235 (1981) ...................................................................................... 26, 28

*Pollux Holding Ltd. v. Chase Manhattan Bank,*
 329 F.3d 64 (2d Cir. 2003) ................................................................................... 27

*Reynolds Corp. v. National Operator Services et al.,*
 73 F. Supp. 2d 299 (W.D.N.Y. 1999) .............................................................. 24, 25

*In re Royal Ahold N.V. Securities and Erisa Litigation,*
 351 F. Supp. 2d 334 (D. Md. 2004) ..................................................................... 16

*Scottish Air International, Inc. v. British Caledonian Group, Inc.,*
 81 F.3d 1224 (2d Cir. 1996) ................................................................................. 26

*Seghers v. Thompson,*
 2006 U.S. Dist. LEXIS 71103 (S.D.N.Y., Sept. 27, 2006) .................................. 13

*Seybold v. Groenink*
 2007 U.S. Dist. LEXIS 16994 (S.D.N.Y. March 12, 2007) .................................. 13

*Stephens v. National Distillers and Chemical Corp.,*
 1996 U.S. Dist. LEXIS 6915 (S.D.N.Y. 1996) ..................................................... 13

*Strategic Value Master Fund Ltd. v. Cargill Financial Services, Corp.,*
 421 F. Supp. 2d 741 (S.D.N.Y. 2006) ............................................... 27, 31, 33, 34

iv

*In re Tyco International, Ltd,*
    340 F. Supp. 2d 94 (D.N.H. 2004) ................................................................ 13

*Wiwa v. Royal Dutch Petroleum Co.,*
    226 F.3d 88 (2d Cir. 2000) ................................................................ 20, 29, 32

**STATE CASES**

*Kreutter v. McFadden Oil Corp.,*
    71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988) ............................ 24, 25

*Potter v. Arrington,*
    810 N.Y.S.2d 312 (Sup. Ct. Monroe County 2006) ............................................ 15

*Tomran, Inc. v. Passano,*
    862 A.2d 453 (Md. Ct. Spec. App. 2004) .......................................................... 14

**MISCELLANEOUS**

U.S. Chemical Safety and Hazard Investigation Board, Investigation Report, *Refinery Explosion and Fire*, No. 2005-04, § 4.1 (March 2007) ...................................... 32

**STATUTES**

N.Y. C.P.L.R. § 301 .......................................................................... 3, 20, 23

N.Y. C.P.L.R. § 302 .......................................................................... 20, 23, 24

v

> **"Companies must obey the law in every jurisdiction in which we operate and if we find the law unacceptable and at odds with our own values we shouldn't be operating in that jurisdiction."**

John Browne, Group Chief Executive of BP p.l.c. ("BP"), Botwinick Prize Acceptance Speech (Columbia Business School, NY, NY, Nov. 17, 2004). *See* Declaration of James E. Tullman ("Tullman Decl."), Ex. A.

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this memorandum of law in opposition to defendants' motion to dismiss the Second Amended Derivative Complaint (the "Complaint" or "Compl.").[1]  As more fully set forth herein and as supported by the accompanying expert Declaration of Victor Joffe, Q.C. ("Joffe Decl."),[2] plaintiffs have properly brought this derivative litigation in this Court and none of the three reasons for dismissal advanced by the defendants warrants the granting of their motion to dismiss.

First, the Complaint does state a cognizable derivative claim under both New York and English law. The principles of *Foss v. Harbottle*, a 160 year old case which defendants and their expert rely upon, have been determined by the United Kingdom itself to be too rigid, unfair, fundamentally unjust and offensive to public policy. Accordingly, they are being abolished by the

---

[1]     The term "defendants" refers to defendants John Browne, Byron E. Grote, David C. Allen, Iain C. Conn, Tony A. B. Hayward, John A. Manzoni, Peter D. Sutherland, Sir Ian Prosser, John H. Bryan, Antony Burgmans, Erroll B. Davis, Jr., Douglas J. Flint, DeAnne S. Julius, Tom McKillop, Dr. Walter E. Massey, William H. Castell, Henry Michael P. Miles, Michael H. Wilson, Robin B. Nicholson, Charles F. Knight, Floris A. Maljers, Richard L. Olver, Rodney F. Chase, John G.S. Buchanan, William Douglas Ford, Robert A. Malone and Ross J. Pillari.

Plaintiffs have agreed to dismiss, without prejudice, the claims against the BP Trader defendants: Cody Claborn, Dennis Abbott, Cameron Byers, Mark Radley and Martin Marz.

[2]     Victor Joffe, a barrister, attorney and expert on UK company law, is the author of *Minority Shareholders: Law, Practice and Procedure* (2nd ed., 2004) and a joint author of *Northey and Leigh's Company Law* and of *Mithani on the Disqualification of Directors* (2nd ed.). *See* Joffe Decl. Ex. VJ1.

1

Companies Act 2006 (the "2006 Act").[3]  Moreover, even if the plaintiffs were precluded from

pursuing a derivative action under *Foss v. Harbottle*, they could still properly assert in this Court a

derivative action under UK law under section 459 of the Companies Act 1985, which, as discussed

below, permits shareholders to "outflank the rule in *Foss v. Harbottle*."

   In any event, this case is not controlled by English law.  As defendants are surely aware and

as this Court has recently held, "the New York Court of Appeals has rejected any automatic

application of the so-called 'internal affairs' choice-of-law rule."  *Pension Comm. of the Univ. Of*

*Montreal Pension Plan v. Banc of Am. Sec. LLC,* 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) (internal

quotations omitted).  Importantly, this Court further held that in determining which forum's law

should apply, the Court must engage in an "interest analysis" to determine which jurisdiction has the

"greatest interest in the litigation."  *Id.*  The defendants do not even attempt to address the interest

analysis.  That analysis, which the Second Circuit has instructed be "flexible" to give controlling

effect to the law of the jurisdiction which "has the greatest concern with the specific issue raised in

the litigation," clearly leads to the conclusion that, under the compelling facts in this case, the United

States and New York have the greatest concern with the issues herein.[4]  *Finance One Public Co. v.*

---

[3]     In enacting the 2006 Act:

Parliament has abolished the antiquated and rigid principles regarding shareholder
derivative claims, and English public policy would permit a claim by a minority
shareholder in right of the company against a director (or any third party legally
complicit in the director's breach of duty etc) for negligence or indeed any breach of
duty owed to the company; (Joffe Decl. ¶ 4C)

[4]     Along with defendant Browne's unambiguous statement that companies must obey
the law in every jurisdiction in which they operate and if they find the law unacceptable or at odds
with their own values they shouldn't be operating in that jurisdiction, the defendants have agreed,
in the Depositary Agreement for the sale of millions of American Depositary Shares ("ADS") on the
New York Stock Exchange ("NYSE"), that:

**"This Depositary Agreement and the Receipts (i.e. the shares) shall be**
**interpreted and all rights hereunder and thereunder and provisions hereof and**
**thereof shall be governed by the laws of the State of New York."**

The BP shares were sold to and are owned by thousands of New Yorkers and other Americans,
making BP the largest non-U.S. company on the NYSE. BP's presence in the United States and New

*Lehman Brothers Special Finance, Inc.*, 414 F.3d 325, 337 (2d Cir. 2005). **All** of the relevant events took place on U.S. soil (including New York), **none** of the events took place in the United Kingdom. Hence, the United Kingdom has **no** interest in controlling this litigation or having it dismissed.[5]

Second, contrary to defendants' argument, they are subject to personal jurisdiction in New York. Indeed, subsequent to the filing of defendants' motion, defendants Browne and Bryan traveled to New York on personal business, where they were tracked down and personally served with the summons and complaint (notwithstanding the presence of bodyguards), conferring personal jurisdiction under section 301 of the CPLR. Further, as more fully set forth herein, many of the defendants are United States citizens, maintain residences in the United States, or conduct substantial business in New York as directors of New York based corporations and otherwise. Additionally, the Complaint sufficiently alleges a prima facie case of specific personal jurisdiction over all of the individual defendants under New York's Long-Arm Statute.

Third, in light of all of the foregoing and in light of defendants' prior positioning of this case in New York, which is the midpoint between England and Alaska, and which the defendants have determined to be a convenient forum for selling stock, maintaining an investor relations office, trading financial instruments and operating numerous service facilities, the Second Circuit's

---

York is extraordinary. The Company's Group Investor Relations Office is located in New York. According to the Company's SEC filings, "approximately one half of BP's fixed assets are located in the USA." The Trans Alaska Pipeline System is first among its "most significant midstream pipeline interests," and Prudhoe Bay is characterized by BP as its most productive field for per day net production. Likewise, BP's Texas City Refinery refines 460,000 barrels a day and has 1,800 employees. It is BP's largest refinery in the United States and is said to be "the most complex facility in the world." In fact, BP's US operations represent the single largest source of its sales and revenues and represent its single largest concentration of employees.

[5]     There was no lack of maintenance, no corrosion, no falsified records, no oil spills, no pipeline shutdown, and no regulatory or other proceeding in England. Neither was their any explosion, deaths or injuries to British subjects or manipulation of British financial markets. Rather, the egregious fiduciary breaches which are the subject of this litigation concern a pipeline in Alaska, a refinery in Texas, a financial exchange in New York, and a disregard for American human life, a widespread tolerance of non-compliance with basic U.S. mandated safety rules, a failure to respond to red flags and a refusal to heed repeated warnings of critical dangers confronting BP's American operations and employees, as well as the trading practices of BP U.S. traders in their attempt to improperly manipulate the United States propane, crude oil and gasoline markets.

direction discussed below, that "District courts should [] arm themselves with an appropriate degree of skepticism in assessing whether the defendant has demonstrated genuine inconvenience and a clear preferability of the foreign forum" is particularly applicable. Any fair and reasonable analysis demonstrates that New York is the most convenient forum in which to litigate this action.

## STATEMENT OF FACTS

Nominal Defendant BP was created in 1998 as a result of the merger of Amoco Corporation, an American company, and the British Petroleum Company p.l.c. BP maintains three operating business segments: Exploration and Production; Refining and Marketing; and Gas, Power and Renewables. According to the Company's SEC filings, "approximately one half of BP's fixed assets are located in the USA." For the years ending December 31, 2003, through 2005, the USA accounted for the single largest source of the Company's sales and operating revenue categorized by geographical area. Moreover, approximately 80% of all BP's segment revenues are generated outside the United Kingdom. *See* BP's March 2007 20-F ("BP 20-F"), Tullman Decl. Ex. B. According to the Company's public filings with the SEC, the Trans Alaska Pipeline System is first among its "most significant midstream pipeline interests," and Prudhoe Bay is its most productive field for per day net production. Additionally, BP's Texas City refinery employs 1,800 people and refines approximately 460,000 barrels of crude-oil each day. The USA also represents the Company's single largest concentration of employees worldwide reported by geographical area. BP is also the largest non-U.S. company on the NYSE. Furthermore, the Company maintains its Group Investor Relations Office in New York, is the leading gasoline marketer in New York City, and employs 647 people in the State of New York. (¶ 13)

### The Prudhoe Bay Shutdown

On August 7, 2006, BP announced that it "has begun an orderly and phased shutdown of the Prudhoe Bay oil field following the discovery of unexpectedly severe corrosion and a small spill from a Prudhoe Bay oil transit line. Shutting down the field will take days to complete. Over time, these actions will reduce Alaska North Slope oil production by an estimated 400,000 barrels

4

per day." (¶ 59) That same day, BP announced that the curtailment amounts to almost half of the total daily production from fields on the Alaskan Northern Slope. In addition, it was reported that State and Federal regulators have launched investigations into the corrosion along BP's oil transit network, including a criminal probe by the EPA. (¶ 62)

On August 9, 2006, MSNBC.com reported that a U.S. criminal investigation is underway to determine whether BP has "deliberately shortchanged maintenance and falsified records to cover it up." Chuck Hamel, an advocate for Alaskan oil workers, claims that a dozen past and current BP employees have informed him that they had been instructed to "cut back on a chemical put into the system to retard rust and corrosion, and to falsify records," an allegation also relayed to FBI investigators. BP acknowledged that a "key maintenance procedure" whereby a probe is used to check for sludge - known as "pigging" - had not been performed in more than a decade. Thomas J. Barrett, administrator of the U.S. Department of Transportation's Office of Pipeline Safety, is quoted in the article as saying he was "disappointed" with BP's "failure to maintain these lines to an accepted industry level of care." Federal regulators assessing the damage observed that the "walls of the pipes were so corroded that they were almost paper thin."[6] (¶ 67)

On August 26, 2006, The Seattle Times reported that BP rejected concerns raised with the Company in November 2001 by Coffman Engineers about the way BP was tracking and reporting Prudhoe Bay pipeline corrosion. Coffman, an American consulting firm, had been retained by the State of Alaska and revised an "extremely negative" draft report at BP's insistence. The revisions are now part of a federal grand jury investigation of BP, as well as investigations by the EPA, the U.S. Department of Transportation Office of Pipeline Safety, and the Attorney General of Alaska. (¶ 70) Plaintiffs are not aware of any investigations in England.

---

[6]       On August 9, 2006, Bloomberg published an article charging that BP had been "cutting corners" since 1999, that its pipeline management and maintenance practices in the United States have been inferior to the practices of other oil companies, and that BP's problems at Prudhoe Bay were hardly a surprise to the Company. (¶ 68)

On December 16, 2006, <u>Anchorage Daily News</u> reported that federal regulatory authorities and criminal investigators are demanding more information regarding the Prudhoe Bay pipeline leak. According to the article:

> Federal regulators are demanding more information from BP about its plans for replacing miles of corroded pipelines in the Prudhoe Bay oil field.
>
> In a Dec. 7 letter to Sandy Stash, BP Alaska's vice president for regulatory compliance and ethics, the regulators cite a "continuing investigation" into this year's Prudhoe pipeline leaks and say the information they seek from BP will "determine the need for additional corrective action."

* * *

> Federal criminal investigators also are looking into the Prudhoe problems and have subpoenaed massive quantities of documents from BP. (¶ 77)

### The Texas City Explosion

On March 24, 2005, <u>The New York Times</u> reported a massive, catastrophic explosion at BP's oil refinery in Texas City, ultimately killing 15 people and injuring 180.  According to the article:

> The plant, BP's largest in the nation, has 1,800 employees, is spread over 1,200 acres and refines 460,000 barrels of crude oil a day.  It is considered "the most complex facility in the world," said another company spokesman, Hugh Depland.  The plant is still operating.  (¶ 81)

In the aftermath of the Texas City explosion, several lawsuits on behalf of killed and injured workers were filed against BP.  The lawsuits allege numerous violations by BP.  On May 5, 2005, the <u>Houston Chronicle</u> reported that:

> The deadly blast at the BP Texas City refinery was caused partly by understaffing in a critical control room, and other workers on duty in the area that exploded were either inexperienced, undertrained or not adequately doing their jobs, plaintiffs in a lawsuit against the company alleged Wednesday.
>
> In an amended lawsuit raising new, specific allegations against BP, two injured workers painted a grim picture of staffing and supervisory problems they say played a key role in the accident.  (¶ 84)

On June 29, 2005, <u>The Guardian (London)</u> reported that a U.S. safety regulator has blamed the explosion on an alarm malfunction.  According to the article:

6

> "Had the alarms sounded properly as the blowdown drum was flooding, it could have alerted operators to the emergency situation," said the board which investigates industrial accidents but does not issue penalties.
>
> The CSB is continuing its inquiry into the explosion at the nation's fourth largest refinery and has requested maintenance records for the alarms and related equipment. (¶ 86)

As the investigation into the explosion continued, additional reports of significant safety violations at Texas City were revealed. According to an August 7, 2005 article in the <u>Houston Chronicle</u>, the Texas City refinery "was the site of repeated malfunctions that could have been prevented if BP correctly and more frequently performed maintenance on the unit." (¶ 87)

Similarly, on August 18, 2005, the <u>Houston Chronicle</u> reported that the explosion could have been prevented. According to the article:

> CSB officials have said in previous briefings that those deaths may have been prevented if the blowdown stack had been equipped with a flare, which may have safely burned away the excess liquids and vapors.
>
> Investigators also have found that a key level indicator and high-level alarms in the splitter either malfunctioned or were not working properly, possibly confusing operators starting up the unit.
>
> On Wednesday, investigators revealed that BP management knew that the level indicator needed repair, but deferred a March 10 work order until after the start-up. (¶ 89)

More disturbing news concerning the explosion continued to be reported. On September 9, 2005, the <u>Houston Chronicle</u> reported that BP kept running a unit even though its pipes were thinning and eroding and constituted a serious safety risk. As stated by the article:

> BP Texas City refinery managers in May knowingly kept running a unit with thinning and eroding pipes - which they considered a serious safety risk - just two months after a blast at another unit killed 15 people, according to an internal BP e-mail the Houston Chronicle obtained. (¶ 90)

On September 23, 2005, OSHA "fined BP a record $21.3 million and charged the company with 300 health and safety violations in the March explosion at its Texas City refinery that killed 15 people." (¶ 91)

7

The repercussions of the Texas City explosion continue to adversely impact BP. Along with the penalties imposed by OSHA, the Company announced that BP's own internal audit discovered "big lapses in management." On November 24, 2005, the Houston Chronicle reported that:

> An internal BP audit that the company refused to make public for the last several months found widespread management and safety problems at its Texas City refinery in the wake of an explosion that killed 15 workers.
>
> The June audit, ordered by BP after the March blast and released by the company Wednesday, discovered major lapses in leadership, risk awareness, compliance with safety policies and workplace conditions.
>
> The scathing review was particularly surprising because 10 of the 17 audit team members were high-level managers of other BP refineries or corporate headquarters. (¶ 92)

Questions regarding the safety at the Texas City refinery and how much BP leaders knew continued into the spring of 2006. On April 17, 2006, the Financial Times reported:

> In late 2004, Don Parus, site manager at BP's biggest refinery, realised something was terribly wrong.
>
> The site had suffered 22 fatalities over 30 years, its safety business plan for 2005 noted there was a key risk of death of a worker in 12-18 months, and a BP safety presentation opened with the words: "Texas City is not a safe place to work."
>
> He commissioned a safety audit by the Telos Group, a Texas-based consultancy, which surveyed more than 1,100 employees, roughly 60 percent of the current workforce, and interviewed over 100.
>
> The 338-page report, a copy of which has been obtained by the Financial Times, reveals a safety culture that make many fear working in the facility.
>
> "The history of investment neglect, coupled with the BP culture of lack of leadership accountability from frequent management changes, is setting BP Texas City up for a series of catastrophic events," is just one comment in the audit.
>
> The report was finalised on January 21, 2005. Two months later, the accident predicted by several in the audit arrived: an explosion killed 15 people and injured an estimated 500 in the deadliest refinery accident in ore than a decade. Four months later, the site suffered another explosion. (¶ 94)

On October 24, 2006, along with announcing a decline in profits of 3.6%, BP also announced that it was setting aside an additional $400 million to resolve legal disputes stemming from the Texas City disaster, bringing the total bill to around $2 billion. (¶ 96)

8

It became clear from published reports that BP ignored warnings, completely disregarded safety at Texas City, and was much more concerned with cost-cutting even at the expense of safety and the risk of a catastrophic event at the refinery. On October 29, 2006, <u>CBS News</u> reported:

> <u>60 Minutes</u> spent the last three months investigating the explosion at Texas City, and what we found was a failure by BP to protect the health and safety of its own workers, even though the company made a profit of $19 billion last year.
>
> <u>60 Minutes</u> also found evidence that BP ignored warning after warning that something terrible could happen at Texas City.
>
> * * *
>
> "<u>The problems that existed at BP Texas City were neither momentary nor superficial. They ran deep through that operation of a risk denial and a risk blindness that was not being addressed anywhere in the organization</u>," says Carolyn Merritt.  (emphasis added)
>
> * * *
>
> But when BP acquired the Texas city refinery from Amoco eight years ago, the plant already was in a state of disrepair.  Instead of spending money to revitalize the plant, BP executives in London told their refinery managers world-wide to cut their budgets.
>
> "Twenty-five percent of their fixed costs were cut.  And when you cut that much out of a budget in a facility, you lose people, you lose equipment, you lose maintenance, you lose trainers," Merritt says.  "Our investigation has shown that this was a drastic mistake." (¶ 97)

Similarly, on October 30, 2006, <u>The Wall Street Journal</u> online edition reported that federal investigators concluded that the Company was aware of "significant" safety, maintenance and infrastructure problems at the refinery and 34 other locations.  According to the article:

> Carolyn Merritt, chairman of the U.S. Chemical Safety and Hazard Investigation Board, said the board's investigation "shows that BP's global management was aware of problems with maintenance, spending, and infrastructure well before March 2005." (¶ 98)

In a civil lawsuit against BP stemming from the explosion, a judge ruled that allegations that BP had "cut corners" in maintaining the Texas City refinery were "quite valid." (¶ 100)

9

Furthermore, on December 7, 2006, The Galveston County Daily News reported that instead of spending money on necessary maintenance, much of the refinery was for many years being held together by "Band-Aids" and "Super-Glue." (¶ 103)

The safety problems being encountered at Texas City were well known to BP's upper management and boards, including defendant Browne. Internal BP e-mails demonstrate that defendant Browne was closely monitoring data from Texas City prior to the catastrophic explosion. On December 9, 2006, The Guardian reported:

> The email sent by Mr. Link in 2003, which is written in arcane acronyms, warned of an increase in injuries and environmental incidents at the site. It continued: "We have 18 BP refineries in the world. Lord Browne looks at monthly data for 17 of 18 refineries all together. He looks at TCR [Texas City refinery] data separately each and every month!" (¶ 105)

As far back as 1999, when BP acquired Amoco, Robert Mancini, a BP consultant, stated in an e-mail to a colleague in bold letters:

> **"Cost of A Human Life. BP embraced the principle that these costs can be specified for the purposes of cost benefit analysis. Amoco was generally unwilling to take this step."** (¶ 80)

This callous disregard for human life and BP's own employees in the United States was reported on November 7, 2006 by the Financial Times, which also noted that a BP document dated October 17, 2002 likened its staff to the "three little pigs" and a massive accident as the "big, bad wolf," asking "which type of house should the piggy build?" BP chose the house of straw because it pegged the cost of human life at merely $10 million, thus justifying continuing neglect of safety, maintenance, and training of American employees. *Id.*

### The Market Manipulation Scheme

Moreover, defendants also breached their fiduciary duties and BP's own internal code of corporate governance, in addition to various federal and state laws and regulations, in their pursuit to control and manipulate the United States propane, crude oil and gasoline markets. BP's propane trading team manipulated and drove up the price for propane in the U.S. Midwest and Northeast in February 2004 by buying up on the NYMEX all available propane in the market. This was done in

10

an attempt to "control the market at will." The team's tactics had been perfected by a previous "trial run" squeeze on the propane market that BP instigated in April 2003.

At the same time, BP is accused of trading irregularities in its global over-the-counter crude oil trades in 2003 and 2004, as well as trading in gasoline on the New York Mercantile Exchange ("NYMEX") in 2002. The Company is alleged to have used inside information about its own oil-delivery system in an attempt to improperly influence crude-oil benchmarks which, in turn, would influence billions of dollars in transactions.

The attempts to manipulate these markets were initiated with the full knowledge and acceptance of senior executives at BP. Indeed, all involved understood that what they were doing had pushed and ripped the envelope. In a document entitled "Lessons Learned," produced by BP in 2004 after its attempt to corner the propane market in the United States, it stated that the actions "could increase the risk of regulatory intervention." Indeed, the defendants' scheme to corner the propane market, as well as their scheme to manipulate the crude oil and gasoline markets, has attracted the attention of not only the U.S. Justice Department in two separate criminal probes, but of the Commodity Futures Trading Commission ("CFTC") and the New York Mercantile Exchange in separate civil complaints, investigations and fines. (¶¶ 7-9, 115-30)

## ARGUMENT

**A.    The United States and New York Have the Greatest
Concern with the Issues Raised in this Litigation**

Defendants seek to dismiss this well-pled action and to gain immunity for themselves on the grounds that neither plaintiffs nor any other shareholder have standing to assert a derivative claim on behalf of BP in this Court or any court anywhere in this world. Defendants' Memorandum of Law in Support of their Motion to Dismiss Plaintiffs' Second Amended Derivative Complaint ("Def. Mem.") at 8. According to the defendants, "Under New York's choice of law rules, it is well settled that a derivative action concerning a foreign corporation such as BP is governed by the law of the state of incorporation." *Id.* Additionally, relying on English law and the Second Declaration of

11

Martin Moore QC ("Moore Decl."), defendants argue that dismissal is warranted because "Plaintiffs do not have standing to assert their derivative claims on behalf of BP under the law of England and Wales." *Id.* at 11. For the reasons set forth below, defendants' arguments provide no basis for dismissal.

While defendants correctly note that New York courts follow the internal affairs doctrine in deciding choice-of-law conflicts, the application of that doctrine is <u>far from absolute</u>. As this Court recently held, "the New York Court of Appeals has rejected any automatic application of the so-called 'internal affairs' choice-of-law rule." *Pension Comm. of the Univ. Of Montreal Pension Plan*, 446 F. Supp. 2d at 192. Importantly, this Court further held that in determining which forum's law should apply, the Court must engage in an "interest analysis" to determine which jurisdiction has the "greatest interest in the litigation". *Id.* Foreign law may be applied only when the other jurisdiction has a "substantial," "overriding" interest in the issues giving rise to the litigation. As stated by the Court:

> "[I]n certain circumstances 'application of the local law of some other state is required by reason of the <u>overriding interest</u> of that other state in the issue to be decided.' The principles compelling a forum state to apply foreign law come into play only when a legitimate and <u>substantial interest</u> of another state would thereby be served."

*Id.* (footnotes omitted; emphasis added). Moreover, the Second Circuit has instructed that the "interest analysis is a 'flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, <u>has the greatest concern with the specific issue raised in the litigation</u>.'" *Id.* at 192 n. 209, *citing Finance One Pub. Co.*, 414 F.3d at 337 (emphasis added).[7] *See also, Norlin v. Rooney, Pace Inc.*, 744 F.2d 255, 263 (2d Cir. 1984) (Rejected automatic application of "so-called 'internal affairs' choice-of-

---

[7]    In this regard, Judge Scheindlin has stated "when the law is one which regulates conduct, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." (internal quotation omitted). *Pension Comm. of the Univ. of Montreal Pension Plan*, 446 F. Supp. 2d at 192.

law," but instead looked at various factors, including location of its operations, location of its shareholders, where the company trades and its contacts with the state of incorporation.)[8]

For example, in *Stephens v. National Distillers and Chemical Corp.*, 1996 U.S. Dist. LEXIS 6915 (S.D.N.Y. 1996), this Court applied New York law to a breach of fiduciary duty claim against a Kentucky corporation. While the Court pointed out that a foreign insurer doing business in New York is subject to New York Insurance Law, the Court based its decision on public policy concerns. According to the Court, "The public policy concerns of New York State as embodied in the New York Insurance Law mandate a departure from the 'internal affairs' doctrine." *Stephens*, 1996 U.S. Dist. LEXIS 6915 at *15. *See also, Norlin*, 744 F.2d 255 (Rejected application of Panamanian Law).[9]

---

[8]      Judge Denise Cote, in *Seybold v. Groenink*, 2007 U.S. Dist. LEXIS 16994 (S.D.N.Y. March 12, 2007), recently dismissed plaintiffs' derivative action based on the Court's application of Dutch law, which strictly prohibits derivative actions. While the plaintiff in *Seybold* believe that the case was wrongly decided and is appealing that dismissal, the facts in the present action are vastly different. In particular, the plaintiffs in the present case, with the support of the Joffe Declaration, have demonstrated that (i) New York and the United States have a greater interest than England in the outcome of the litigation, and England does not have a "substantial" or "overriding" interest in the issues giving rise to the litigation; (ii) unlike *Seybold*, the Complaint here pleads that the defendants stipulated that New York law shall govern; (iii) the rigid rules in *Foss v. Harbottle*, have been abolished by the passage of the Companies Act 2006 ("2006 Act") as being antiquated and unjust to minority shareholders; and (iv) plaintiffs are not necessarily precluded by *Foss v. Harbottle* from pursuing a derivative action under UK law. As such, the *Seybold* decision provides no basis to dismiss this case.

[9]      The cases relied upon by defendants (*see* Def. Mem. at 8-9, 17), which predate the passage of the 2006 Act, further recognize that refusal to apply the law of the state of incorporation would be warranted when it would violate public policy. For instance, in *Hausman v. Buckley*, 299 F.2d 696, 705 (2d Cir. 1963), the Second Circuit held that appellants' argument failed not because the internal affairs doctrine is absolute, but rather because (unlike the case here) the appellants failed to demonstrate that application of foreign law would "outrage[] public policy." According to the Second Circuit, "we are not persuaded that the Venezuelan law under consideration is 'immoral' or 'fundamentally unjust' or that it contravenes any New York policy involving the right of stockholders to participate in the management of a corporation through the intervention of the courts." *Id.* Unlike the facts in *Hausman*, plaintiffs have demonstrated that not only do the United States and New York have a greater interest in the litigation but that the English Parliament has already determined that the rule in *Foss v. Harbottle*, as it applies to minority shareholders' ability to assert a derivative action, was fundamentally unjust. *See* Joffe Decl.; *See also, Seghers v. Thompson*, 2006 U.S. Dist. LEXIS 71103 (S.D.N.Y. Sept. 27, 2006) (Parties agreed that rule in *Foss v. Harbottle* governed and plaintiff never argued that New York had superior interest or that rule was fundamentally unjust); *In re Tyco Int'l, Ltd.*, 340 F. Supp. 2d 94 (D.N.H. 2004) (Plaintiff never

The exceptional facts in this case demonstrate that the United States and New York have the "greatest concern with specific issues raised in the litigation," and that England certainly has no "substantial" or "overriding" interest.[10] Furthermore, unlike the cases relied upon by defendants, this case concerns one of the most sensitive and compelling issues confronting the United States and, in particular, New York -- protecting the safety of our citizens, environment and our financial markets and the investors that trade on them -- from companies conducting business in such a wanton and reckless manner. It is indisputable that defendants' gross misconduct and willful and wanton breaches of their fiduciary duties have put our national and local interests at grave risk. Given the grave consequences of defendants' misconduct regarding the events that have taken place with respect to the (i) market manipulation in New York, (ii) catastrophic explosion at Texas City, and (iii) massive oil leak at Prudhoe Bay, it would be utterly absurd for defendants to argue that New York and the United States do not have a superior interest in the outcome of this litigation.

---

argued that New Hampshire had greater interest in the litigation); *Tomran, Inc. v. Passano*, 862 A. 2d 453, 467 (Md. Ct. Spec. App. 2004) (While holding the plaintiff did not successfully allege a cause of action based on the fraud on the minority exception, the court did note the existence of a possible fifth exception, "which would allow a shareholder to bring a cause of action 'where justice of the case demands it.'").

[10]     Defendants further seek to dismiss this action on the ground that plaintiffs' claims are double derivative and according to defendants' expert "neither a double derivative action nor a multiple derivative action is maintainable under English law." Def. Mem. at 19. Defendants' arguments are both factually and legally unfounded. While plaintiffs have named a number of BP subsidiaries as nominal defendants, the bulk of plaintiffs' allegations are based on injuries suffered by BP itself at the hands of the wrongdoers. As detailed in the Complaint, BP has suffered billions of dollars in damages in connection with wrongful death suits, clean up and repair costs at both Prudhoe Bay and Texas City and multiple civil fines and penalties. Moreover, not only are multiple derivative actions ("MDA") proper in this jurisdiction, no English Court has ruled them improper. *See Goldstein v. Groesbeck*, 142 F.2d 422, 425 (2d Cir. 1944), cert. denied, 323 U.S. 737 (1944) ("we think it clear that a stockholder can maintain a double derivative action in the federal courts"). In fact, as set forth in the Joffe Declaration, a Hong Kong court applying English law held that a MDA was available. According to the court: "I can see no reason in principle why a shareholder of the parent should not be permitted to bring a derivative action on behalf of the subsidiary which has suffered loss." Joffe Decl. ¶ 62. Thereafter, the Court of Appeals affirmed the lower court's ruling, holding that "it nevertheless appears to me that there are very strong arguments that a double derivative is maintainable. Derivative actions are, after all, a procedural means devised by the courts to enable a minority shareholder to enforce the rights of a company in relation to wrongs inflicted by insiders." *Id.* at 63. As such, there is no basis, either under New York or English law, to prohibit the prosecution of this action.

14

Moreover, of the numerous civil and governmental actions and investigations stemming from the above events, plaintiffs are unaware of any action, proceeding or investigation that has been initiated against any of the defendants in the United Kingdom. To the contrary, the U.S., including New York, has been the exclusive forum for the hundreds of cases, proceedings and investigations that have been launched against the defendants.[11]

In fact, defendants do not even attempt to address the "interest analysis," but rather merely argue that the internal affairs doctrine compels that "the law of England and Wales governs whether the Complaint states a proper derivative claim." Def. Mem. at 10. Defendants' contentions completely ignore the well founded law on this subject. Instead, what the defendants should have been addressing was whether England and Wales have any legitimate, substantial, or overriding interest in this litigation or whether the defendants' activities are so alarming and so U.S. based that they warrant New York and the United States having "an interest superior" to that of the state of incorporation. *Potter v. Arrington*, 810 N.Y.S. 2d 312, 315 (Sup. Ct. Monroe County 2006). Given the (i) grave nature of the defendants' activities, all of which occurred in the United States, (ii) New York's and the United States's strong interest in protecting its citizens and environment from the gross misconduct of directors conducting business within our borders, (iii) New York's and the United States's strong interest in protecting the integrity of our financial markets from financial institutions engaging in illegal activities, (iv) Browne's remarks to obey the laws of the jurisdictions BP operates in, (v) defendants' agreement to have New York law govern the rights of the plaintiffs and other American shareholders,[12] and (vi) New York and the United States being the situs of the

---

[11]    These include tort cases, investigations by the U.S. Department of Justice, the FBI, the U.S. Congress, the CFTC, the Alaska State Attorney General, OSHA, NYMEX, the U.S. Chemical Safety and Hazard Investigation Board, and the Baker Panel.

[12]    Defendants cite *City of Sterling Heights Police & Fire Retirement System v. Abbey National, plc*, 423 F. Supp. 2d 348 (S.D.N.Y. 2006), to persuade this court that "the choice of law analysis is not affected by the choice of law clause contained in the [BP] Depositary Agreement... [because] the depositary agreement did not specify that New York law governed 'without giving effect to conflict of law principles.'" Def. Mem. at 10. However, unlike the plaintiff in *City of Sterling*, whose sole basis for New York law was the choice of law provision in the depositary

15

complained of events and the harm, New York and the United States clearly have a superior interest

to England and Wales in seeing that the wrongdoers are held accountable for their misconduct. As

stated in *In re Royal Ahold N.V. Securities and Erisa Litigation*, 351 F. Supp. 2d 334, 353 (D. Md.

2004):

> While courts in the Netherlands have a strong interest in preventing fraud in the
> Netherlands, the United States has a similar interest in preventing fraud here, in
> protecting the integrity of its stock markets, in promoting investor confidence, and
> in providing relief under federal statues to those harmed by securities fraud.
>
> * * *
>
> Consequently, in light of the defendants' contacts with the U.S., the alleged harm that
> resulted to investors in the U.S., and the interests of the U.S. in enforcing its
> securities laws to protect investors, this court can reasonably and legitimately
> exercise jurisdiction over Van der Hoeven, Meurs, and Andreae.
>
> Accordingly, public policy warrants the denial of defendants' motion.

**B.    The Principles of *Foss v. Harbottle*, Which Defendants
       Rely Upon, Have Been Determined by the UK Itself to be Too
       Rigid and Unfair and are Being Abolished by the Companies Act 2006**

Along with the fact that the United States and New York undoubtedly have a far greater

interest in the outcome of this litigation than the United Kingdom, the exception to the internal

affairs doctrine is further warranted based on defendants' version of the law in the United Kingdom

being unfair and offending public policy as it applies to minority shareholders' right to assert a

derivative action. While defendants' expert, Mr. Moore, mentions the fact that the United Kingdom

had recently passed the Companies Act 2006, he completely ignores the impact of the new law. In

fact, the passage of the 2006 Act (whose relevant provisions take effect in October 2007 and not in

October 2008 as represented by Mr. Moore) (*see* Moore Decl. at n.11),[13] was a major legal event and

was based on the United Kingdom's own determination that the current state of the law was unfair

---

agreement, the plaintiffs in the present case have supplied the court with a number of compelling
facts, in addition to the defendants' agreement to have New York law govern, as to why application
of New York law is proper.

[13]    *See* Annex A, Companies Act 2006 Commencement Timetable, Minister for Industry
and the Regions, February 28, 2006.  Attached to Tullman Decl. as Ex. C.  *See also*, Joffe Decl. ¶ 38.

to minority shareholders and therefore violated public policy.  As discussed in detail in the

Declaration of Victor Joffe:

> Mr Moore makes reference to the 2006 Act in the concluding paragraph to his
> Declaration.  Whilst many provisions of the new Act have yet to be brought into
> force, the Government intends to bring it fully into force within the short to medium
> term.  Indeed, the Government has made a public notification that it intends to bring
> the provisions relating to derivative claims by members (i.e. shareholders) into effect
> on 1 October 2007.  Both the language and scheme of the new Act in relation to
> directors' duties and derivative claims mark a further development of English law in
> this area, although as Mr Moore also notes, only the accretion of judicial
> interpretation of the provisions will determine how extensive an effect they
> eventually come to have on English company law.  (Joffe Decl. ¶ 38)

> As noted above, Parliament has, recently enacted section 260(2)(b), which clearly
> indicates that derivative relief may be sought in the context of unfair prejudice
> claims.  Moreover, and most significantly, the wording of section 260(3) marks a
> very significant expansion of the jurisdiction.  As set out at paragraph 12 above, the
> jurisdiction to date has only been available where a minority shareholder can show
> that "... *what has been done amounts to fraud and the wrongdoers are themselves in*
> *control of the company*".  Section 260(3), however, provides that derivative actions
> may be brought in relation to acts or omissions "*involving negligence, default, breach*
> *of duty or breach of trust*".  There is, therefore, absolutely no requirement to show
> fraud under the new regime.  Negligence will clearly suffice and, moreover, even
> default and breach of duty falling short of any negligence can be made the subject of
> a derivative claim. This provision plainly has the potential greatly to increase the
> ambit of derivative actions, particularly given the wider duties imposed on directors
> by the new statute.  (Joffe Decl. ¶ 44)

> Therefore, it can be seen from the express language of Parliament that there can be
> no question that it has elected to abolish the antiquated and rigid principles regarding
> shareholder derivative claims, and that English public policy would permit a claim
> by a minority shareholder in right of the company against a director (or any third
> party legally complicit in the director's breach of duty etc) for negligence or indeed
> any breach of duty etc.  (Joffe Decl. ¶ 45)

> It is important to grasp that the common law requirement of "wrongdoer control" has
> not been reproduced in the 2006 Act. Neither section 261 nor section 263 imposes
> as a pre-condition for the bringing of a derivative action that the claimant establish
> that the company is controlled by the wrongdoers: proof of "control" is accordingly
> not an element of the 2006 Act procedure.  Given that neither proof of wrongdoer
> control nor proof of fraud is a requirement under the 2006 Act (see paragraph 43
> above), it is evident that the new statute is a radical departure from the common law
> rules and may be expected to make a material difference, in many cases, to the ability
> of a minority shareholder to bring a derivative action.  (Joffe Decl. ¶ 49)

> Section 263 then provides the courts with guidance as to whether or not permission
> to continue a claim should or should not be granted.  Perhaps the key criterion here
> is that the courts are to assess whether the act or omission complained of "*could be,*
> *and in the circumstances would be likely to be, ratified by the company*" (section

263(3)(d)). This is intended to preserve the basic rule of majority control of the company in relation to ratifiable breaches of duty by directors (although it also very clearly retains the right of minorities to bring derivative claims in relation to non-ratifiable breaches of duty). (Joffe Decl. ¶ 50)

However, what is significant is that it is no longer sufficient to defeat a derivative claim by a minority shareholder that the majority *could* ratify the wrongful act or omission (which hitherto has been a complete bar on such claims, absent fraud on the minority). Under the new regime, the court will have to evaluate whether it is likely that, were the matter put to them, the majority would ratify the wrong. "*Likely*" in this context can only, in my view, mean a 50% or greater chance of them doing so – or, in other words, it is a requirement that the court be satisfied on the balance of probabilities that the majority would ratify the wrongful act (in circumstances where, ex hypothesi, the company's board has elected not to ask them as yet). (Joffe Decl. ¶ 51)

**C.      Even if the Court Were to Rule the Law of the United Kingdom Applies, Plaintiffs Would Still be Able to Assert a Derivative Claim on Behalf of BP**

Defendants' have devoted a significant amount of their memorandum to support their argument that plaintiffs, under the laws of the United Kingdom, would lack standing to assert a derivative claim on behalf of BP. As stated in defendants' papers, under the rule of *Foss v. Harbottle*, "a shareholder cannot bring a derivative action for wrongs to the company that are capable of ratification by a majority of shareholders unless an exception to the rules applies." Def. Mem. at 11.[14] According to the defendants, plaintiffs' claims do not fall within one of the exceptions to the rule of *Foss v. Harbottle*. Nevertheless, even if it were "likely" that the wrongs would be ratified by BP's shareholders and even if none of the exceptions of *Foss* were applicable, plaintiffs would still not necessarily be foreclosed from pursuing a derivative action under English law. As stated in detail in the Joffe Declaration, a minority shareholder could still pursue a claim on behalf of a company even if that shareholder did not satisfy one of the exceptions. According to Mr. Joffe:

Over the years since 1985, the English courts have developed a considerable jurisprudence on the scope and implications of the section 459 regime, which by virtue of section 461 of the Companies Act 1985 enables the court to grant a wide range of types of relief. Certain aspects of this jurisprudence relevant to this Declaration are as follows. (Joffe Decl. ¶ 26)

---

[14]      As set forth above, the test for maintaining a derivative action in the UK has been changed from whether the wrongs are "capable of ratification by a majority of shareholders," to whether would be "likely" to do so. (Joffe Decl. ¶51).

In the first place, the courts have fully acknowledged, as the Jenkins Committee intended, that the section 459 regime is intended, in part, to permit minority shareholders to "outflank" the rule in *Foss v Harbottle*. Hence, Hoffman J [footnote omitted] in *Re Saul Harrison* [1995] 1 BCLC 14 gave clear support to the notion that a claim under the unfair prejudice regime can be available to minority shareholders in relation to a director's breach of fiduciary duty where no derivative action would lie:

> "... *But the fact that the board are protected by the principle of majority rule does not necessarily prevent their conduct from being unfair within the meaning of* [section 459]. *Enabling the court in an appropriate case to outflank the rule in Foss v Harbottle was one of the purposes of the section.* (Joffe Decl. ¶ 27)

I went on in the book to note, at paragraph 5.128:

*"This decision is, potentially, very significant, since it opens up the prospect of minority shareholders achieving remedies under s 461 on the basis of unfair prejudice allegations that otherwise they would have to try to obtain through the more complex and restrictive derivative action. This is not uncontroversial and the decision has been criticised as opening the door to minority shareholders obtaining corporate remedies in response to a corporate wrong without satisfying the requirements of leave and notice which restrict access to the derivative action in order to ensure that a company's assets are not wasted on imprudent litigation...* (Joffe Decl. ¶ 29)

Notwithstanding such concerns, however, and as I note in paragraph 43 below, Parliament has, at section 260(2)(b) of the Companies Act 2006 expressly provided that derivative claims may be brought "*in pursuance of an order of the court*" within unfair prejudice proceedings. (Joffe Decl. ¶ 31)

Whilst the position under English law is not, therefore, wholly clear cut, recent judicial development in England has clearly been towards further liberalisation of the mechanisms whereby minority shareholders can pursue directors for breach of duty. This is a trend taken yet further forward by Parliament in the 2006 Act, as I discuss below. (Joffe Decl. ¶ 32)

Notwithstanding, however, that the section 459 "unfair prejudice" regime has frequently provided an effective remedy (generally by way of a court-directed buy out of a prejudiced minority shareholder's interest) in many situations in which the board of a company has conducted itself in an manner inconsistent with core fiduciary duties, the position has remained much more challenging for a minority shareholder in the face of simple poor management of a company's affairs. (Joffe Decl. ¶ 33)

It can, therefore, be seen that the allegations of egregious and repeated misbehaviour contained in the Plaintiffs' Amended Derivative Complaints, being ones of wilful and reckless breaches of fiduciary duty and/or breaches of duties of care and skill owed to the company are ones which are analogous to complaints made in cases that have come before the English courts (albeit in the context of companies much smaller than BP) and in which the English courts have developed the section 459 regime to provide appropriate relief. (Joffe Decl. ¶ 37)

Thus, even if, *arguendo*, the plaintiffs are precluded from pursuing a derivative action under *Foss v. Harbottle*, this Court should still determine that plaintiffs can properly assert a derivative action under U.K. law.[15]

## D.   The Complaint Sufficiently Alleges a Prima Facie Case of General Personal Jurisdiction over Defendants

Defendants further seek dismissal of plaintiffs' action on the grounds that plaintiffs have failed to adequately allege that this Court has personal jurisdiction over the defendants. According to the defendants, "This Court cannot exercise general jurisdiction over any of the individual moving defendants." Def. Mem. at 21. For several reasons, defendants' arguments fail.

The first step in determining whether a federal court has personal jurisdiction over a defendant is for that court to determine whether the defendant is subject to personal jurisdiction under the forum state's laws -- law with which this Court is especially familiar. The laws governing whether an individual is subject to personal jurisdiction in New York are set forth in sections 301 and 302(a) of the CPLR. Under § 301, a foreign defendant is subject to general jurisdiction if it is "doing business" in New York. This standard has been construed to mean that the defendant's conduct of business is so continuous and systematic that it will be considered to be present in this jurisdiction and subject to any suit brought here. *See Aerotel Ltd. v. Sprint Corp.,* 100 F. Supp. 2d 189 (S.D.N.Y. 2000); *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88 (2d Cir. 2000).

It cannot be disputed that this Court has general personal jurisdiction over most, if not all, of the individual defendants. First and foremost, jurisdiction as to defendants Browne and Bryan cannot be contested as they have been personally served in this jurisdiction.[16] Pursuant to § 301, "Persons who are not domiciliaries are subject to personam jurisdiction if they are served with

---

[15]   In the event that the Court determines that plaintiffs cannot pursue this litigation at the present time because the 2006 Act does not become effective until October 2007, but would be able to do so after the effective date, plaintiff respectfully request a stay of this litigation until the effective date or leave to amend after the effective date.

[16]   On March 26, 2007, defendants Browne and Bryan were personally served while in New York on personal business.

process while they are physically present in New York State (*Rawthorne, supra*). This is sometimes referred to as "transient" jurisdiction. (*See Burnham v. Superior Court of California* (1990) 495 U.S. 604, 109 L. ed 2d 631, 110 S. Ct. 2105)." Also, defendants acknowledge, many of the defendants are U.S. citizens and/or maintain residence in the United States.[17] Moreover, many of the defendants conduct substantial business in New York through their positions with BP and BP America, which maintains its Group Investor Relations office in New York.[18] In fact, many defendants have signed numerous filings with the SEC and NYSE, including BP's Form F-3s for the registration of additional American Depositary Shares and debt, which expressly provide that the "Indenture, the Securities and the Guarantees shall be governed by and construed in accordance with the laws of the State of New York."[19]

Additionally, the majority of the defendants conduct substantial personal business in New York as directors of New York based corporations or companies that maintain extensive operations in New York.[20] Furthermore, many of the defendants conduct substantial personal business in New

---

[17]     These defendants include: John H. Bryan (citizen and Illinois resident); Erroll B. Davis Jr. (citizen and Georgia resident); William Douglas Ford (citizen and Florida resident); Charles F. Knight (citizen and Missouri resident); Walter E. Massey (citizen and Georgia resident); Robert A. Malone (citizen and Texas resident); Ross J. Pillari (citizen and Florida resident); Byron E. Grote (citizen); Deanne S. Julius (citizen); Rodney F. Chase (Florida resident); and Michael H. Wilson (Washington, D.C. resident).

[18]     These defendants include: Tony A.B. Hayward (responsible for oversight of BP's U.S. operations); Robert A. Malone (Chairman and President of BP America Inc., and BP's chief representative in the U.S.); Ross Pillari (former President of BP America); John A. Manzoni (BP's Regional President for the Eastern U.S. in 2000 and Executive Vice President and Chief Executive for BP's gas and power segment in 2001); Iain C. Conn (chairman of BP Pension Trustees Ltd., and functional responsibility for, among other things, BP's safety and operations and pension operations); Henry Michael P. Miles (former director of BP Pension Trustees Ltd.); and David C. Allen (Chairman of BP Trustees Ltd., and formerly worked in BP's corporate offices in New York).

[19]     These defendants include: John Browne, Byron E. Grote, Peter D. Sutherland, Ian M.G. Prosser, John H. Bryan, Errol B. Davis Jr., DeAnne S. Julius, Walter E. Massey, Henry Michael P. Miles, Michael H. Wilson, Robin B. Nicholson, Charles F. Knight, Floris A. Maljers, Richard L. Olver, Rodney F. Chase, John G.S. Buchanan and William Douglas Ford.

[20]     These defendants include: John Browne (non-executive director of Goldman Sachs Group Inc.); John A. Manzoni (member of the Advisory Board of Accenture Energy); John H. Bryan (board member of Goldman Sachs Group Inc.); Antony Burgmans (member of the Supervisory

21

York through their work with various foundations, societies, and other entities that are New York based or conduct substantial business in New York.[21] Based on the systematic and continuous personal business that defendants conduct in New York, it is certainly reasonable for this Court to exercise jurisdiction over the defendants.

The defendants seek to convince this Court that dismissal is warranted because the defendants' contacts with New York are (i) not "continuous, permanent and substantial," and (ii) that plaintiffs have not alleged that "any 'business' of the individual moving defendants in New York was their own personal business as opposed to business conducted in the capacity of a director or officer of a corporation." Def. Mem. 22-23. Defendants' arguments are easily dismissed. As discussed above, the defendants conduct substantial personal business in New York. The plaintiffs have further alleged that defendants' business contacts with New York are "continuous, permanent and substantial." In addition, defendants' efforts to hide behind their BP corporate titles are grossly misplaced. While plaintiffs do contend that the defendants' BP activities in New York (i.e. BP's Group Investor Relations Office, NYMEX trading, and execution of the Depositary Agreement and other BP filings) are factors that the Court should consider, the bulk of plaintiffs' allegations concern defendants' business activities in New York through their non-BP business activities with numerous New York based corporations, foundations and societies. These non-BP activities are not at the

---

Board of ABN AMRO Bank NV); Peter D. Sutherland (former General Partner of Goldman Sachs Group Inc.); Douglas J. Flint (Finance Director of HSBC Holdings plc.); Tom McKillop (Chairman of The Royal Bank of Scotland Group and former chief executive of AstraZeneca plc); William H. Castell (director of General Electric); Henry Michael P. Miles (Chairman of Schroders); Tony A.B. Hayward (former member of Citibank's Advisory Board); Rodney F. Chase (senior advisor for Lehman Brothers Holdings Inc.); and Charles F. Knight (board member of IBM and former board member of Morgan Stanley).

[21]     These defendants include: John Browne (board member of Catalyst, global counselor of the Conference Board, Inc., member and former Chairman of the British American Business Inc., and Chairman of the Advisory Board of Apax Partners Worldwide LLP); Byron E. Grote (member of Cornell University Graduate School of Management Advisory Council and member of Chemist's Club); John H. Bryan (former Chairman of Catalyst); Erroll B. Davis (former board member of The Conference Board Inc.); DeAnne S. Julius (Chairman of Chatham House); Walter E. Massey (director of The Commonwealth Fund and trustee of The Andrew W. Mellon Foundation); and Peter D. Sutherland (member of the Bar of New York).

behest of BP or an employer, but rather for the personal benefit (reputational and financial) of the defendants. As stated by the court in *Childs v. Schwind*, 1995 U.S. Dist LEXIS 12016 *9-14 (M.D.N.C. June 12, 1995), in response to defendants' argument that defendants' contacts with North Carolina are in "corporate capacity, not an individual capacity":

> Defendant was the sole shareholder of DCC and president and chairman of the board of the two North Carolina subsidiaries. Defendant received direct personal benefits from the North Carolina operations, and it would seem unfair to allow Defendant to negotiate and conduct corporate business in North Carolina in which he "personally had so direct and substantial an interest and then allow [him] to avoid liability responding in [North Carolina] to legal charges addressed to [him] personally which arise from those transaction." (citation omitted)

In contrast, the cases cited by defendants involve situations in which dismissal was granted because the alleged basis for jurisdiction were defendant's business activities as an employee of the named corporate defendant and not based on "doing business" for the personal benefit of the defendant. [22] Def. Mem. at 22-3. It is indisputable that the basis of general jurisdiction over the defendants in this case is their personal business activities and not merely their services as employees acting at the behest of BP.

### E.   The Complaint Sufficiently Alleges a Prima Facie Case of Specific Personal Jurisdiction under New York's Long-Arm Statute over All the Individual Defendants

In addition to the general personal jurisdiction conferred upon defendants pursuant to CPLR § 301, New York's Long-Arm Statute confers specific personal jurisdiction over all the individual defendants. The statute, in pertinent part states:

> § 302 Personal Jurisdiction by Acts of Non-Domiciliaries.
> (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, ... who in person or through an agent:

---

[22]   This Court's decision in *Ontel Products v. Project Strategies Corp.*, 899 F. Supp. 1144 (S.D.N.Y. 1995), provides no support for defendants' argument. Unlike the facts in *Ontel*, in which Ontel sought "[j]urisdiction over Ziskind based solely on his position as President of P.S.C.," the plaintiffs in the present case allege jurisdiction over the defendants based on their "doing business in our State individually," and not solely at the behest of BP or another employer. *Id.* at 1148.

\* \* \*

3. commits a tortious act without the state causing injury to person or property within the state, ... if he...

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or, international commerce.

Section 302(a)(3) clearly provides another basis for jurisdiction over the individual defendants. Defendants contend that they are all located outside of New York. However, § 302(a)(3) allows for the exercise of jurisdiction over defendants who commit tortious acts outside New York but cause injury in New York. Indeed, the location of the injury was New York, where the illegal market manipulation complained of occurred. In particular, the Complaint alleges in detail how defendants sought to manipulate the market for various commodities traded on NYMEX. (¶ 115-30) *See Neewra, Inc. v. Manakh Al Khaleej Gen. Tradin and Contracting Co.,* 2004 U.S. Dist. LEXIS 13556, \*6 (S.D.N.Y. July 20, 2004) ("The situs of the injury is the location of the original event which caused the injury"). Additionally, in the BP Depositary Agreement and in filings with the SEC, defendants specifically agreed that New York law will govern disputes arising out of the purchase of BP's American Depositary Shares. Thus, it is reasonable for the defendants to expect that they would be subject to this Court's jurisdiction should they violate it, the very violation which forms the crux of plaintiffs' Complaint.

In addition, the fact that the allegations are based on defendants' activities as senior officers and directors of BP does not bar jurisdiction under New York's Long-Arm Statute. According to the court in *Reynolds*:

At one time, the Second Circuit interpreted New York's long-arm statute as providing a "fiduciary shield," which protected a corporate employee from being subject to jurisdiction in New York for "acts performed by a person in his capacity as a corporate fiduciary." *Marine Midland Bank*, 664 F.2d at 901. In 1988, the New York Court of Appeals rejected this doctrine, however, and held that the long-arm statute was not "intended to accord any special treatment to fiduciaries acting on behalf of a corporation or to insulate them from long-arm jurisdiction for acts performed in a corporate capacity." *Kreutter v. McFadden Oil Corp.*, 71 N.Y. 2d 460, 470, 527 N.Y.S. 2d 195, 522 N.E. 2d 40 (1988). So, defendants Sandler and

24

> Kay's contention here that there can be no personal jurisdiction over them because their acts were done in a representative capacity is foreclosed by *Kreutter*.

*Reynolds Corp. v. National Operator Services et al.,* 73 F. Supp. 2d 299, 303 (W.D.N.Y. 1999) (internal citations omitted).

Morever, the Second Circuit has held that pursuant to the New York long-arm statute, if the "individual defendant engaged in 'purposeful activities' in New York in relation to the transaction at issue 'for the benefit of and with the knowledge and consent of' the individual defendants, and the individual defendants exercised 'some control' over the corporation, then personal jurisdiction over the individual defendants exists." *Id., citing Kreutter,* 71 N.Y.2d at 467.

Plaintiffs have set forth very specific allegations about the defendants sufficient to establish that they are primary actors, who exercised control over BP which caused it to engage in purposeful activity within New York State with the full knowledge and consent of the defendants.  Plaintiffs have alleged that the defendants control the business and corporate affairs of BP.  (¶¶ 56-58) Plaintiffs have also specifically alleged that the defendants engaged in this persistent conduct and they directed and authorized the unlawful trades on NYMEX for the purpose of deriving substantial revenue therefrom. "At this stage of the proceedings, the test is a pleading requirement and nothing more" and the plaintiffs have made a prima facie showing of personal jurisdiction over the individual defendants.  *Reynolds Corp.,* 73 F. Supp. 2d at 304.

**F.     The Exercise of Jurisdiction over the Defendants is Constitutional
         Under the Due Process Clause of the Fourteenth Amendment**

As stated above, the defendants are all subject to personal jurisdiction in New York and, moreover, all have minimum contacts, either through the Company or otherwise, with New York. Employing the five-factor test enunciated by the Supreme Court, *see Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 112 (1987), plaintiffs' assertion of personal jurisdiction is reasonable: (1) the exercise of jurisdiction over the defendants will not impose an undue burden upon them, as they have already retained counsel and are litigating this case in this jurisdiction; (2) the interests of New York in adjudicating this case are immense - many of the violations of law occurred in New

25

York; (3) a derivative suit is the most convenient and effective way to obtain relief in this situation; (4) litigating the case in this forum would lead to the most efficient resolution of this controversy; and (5) New York State and the United States have an overriding interest in furthering the substantive social policy of stopping foreign defendants from exposing our citizens, environment and financial markets to grave risk by their willful, reckless and negligent conduct in the United States and New York. Therefore, the exercise of jurisdiction over the defendants is both reasonable and constitutional.

## G.    New York is the Most Convenient Forum in Which to Litigate this Action

Defendants' argument that New York is an inconvenient forum -- for the defendants -- in which to pursue this case, and that it is preferable to litigate the derivative claims in England, is disingenuous. These are the same defendants who repeatedly hop over the pond in private jets or on flat beds in commercial aircraft to do business in New York, Texas and Alaska. And these are the same defendants who made it clear to counsel and the Court that New York, the mid-point between London and Prudhoe Bay, is a far more convenient jurisdiction than Alaska. However, the Second Circuit has directed that "[d]istrict courts should [] arm themselves with an appropriate degree of skepticism in assessing whether the defendant has <u>demonstrated genuine inconvenience and a clear preferability of the foreign forum</u>." *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 75 (2d Cir. 2001) (emphasis added).

*Forum non conveniens* is analyzed in a three-step process. First, the court must determine "the degree of deference properly accorded the plaintiff's choice of forum." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 U.S. 146, 153 (2d Cir. 2005) (internal citations omitted). <u>Second</u>, the court considers whether there is an adequate alternate forum in which to pursue the litigation. <u>Last</u>, the court "balances the private and public interests implicated in the choice of forum." *Id.* In general, however, "[a] plaintiff's choice of forum should not lightly be disturbed," *Scottish Air International, Inc. v. British Caledonian Group, Inc.*, 81 F.3d 1224, 1232 (2d Cir. 1996) (*citing Piper Aircraft v. Reno*, 454 U.S. 235, 241 (1981)), especially when the plaintiff has chosen his home

forum. *See Piper Aircraft*, 454 U.S. at 255-56. The *forum non conveniens* analysis in "[e]ach case turns on its facts." *Koster v. (American) Lumbermen Mutual Casualty Co.*, 330 U.S. 518, 528 (1947) (internal citations omitted).

### 1.    Plaintiffs' Choice of Forum Should be Given the Utmost Deference

The underlying rationale in analyzing the proper degree of deference to be accorded plaintiffs' choice of forum has been explained as "[t]he more it appears that a [] plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice." *Iragorri*, 274 F.3d at 71-2[23]. In assessing what deference should be given to plaintiff's choice of forum, the court looks to the "likely motivation in light of all the relevant indication." *Strategic Value Master Fund Ltd. v. Cargill Financial Services, Corp.*, 421 F. Supp. 2d 741, 755 (S.D.N.Y. 2006), *citing, Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 73 (2d Cir. 2003). Those reasons include, among others, the convenience of the plaintiffs' residence to the forum and other reasons relating to the convenience and expense of the litigation. *See, e.g., Iragorri*, 274 F.3d at 72.

One plaintiff in this action is a resident of New York and both are residents of the east coast of the United States. It is inarguable that this forum is most convenient for them while, on the other hand, litigating in England would be nearly impossible for them. The evidence in this case - in terms of the situs of the events (i.e. the leak, explosion and market manipulation), depositions and actual documents - is by far more accessible in the U.S. Plaintiffs' motivation is to litigate this case as

---

[23]    Another way to articulate the analysis of the deference given to the plaintiffs' choice of forum is "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*." *Iragorri*, 274 F.3d at 72 (emphasis added). *See also, Pension Comm. of the Univ. of Montreal Pension Plan*, 446 F. Supp. 2d at 192. ("When the law is one which regulates conduct, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.") (internal quotation omitted).

vigorously and efficiently as possible on behalf of BP and to recoup the losses BP sustained at the hands of the alleged wrongdoers.

Defendants argue that since this litigation is a shareholder derivative litigation, plaintiffs' choice of forum here "is entitled to little, if any, weight." Def Mem. at 25. Defendants are plainly wrong and misconstrue the relevant case law for their own ends. First, "less deference" does not mean no deference. *See DiRienzo v. Phillip Services Corp.*, 294 F.3d 21, 28 (2d Cir. 2002) ("Affording less deference to representative plaintiffs does not mean they are deprived of all deference in their choice of forum."). Defendants cite to *Piper Aircraft* to support this proposition. However, contrary to defendants' argument, nowhere in *Piper Aircraft*, 454 U.S. at 256, does the court discuss "real part[ies] in interest" (Def. Mem at 25), and the weight entitled to the choice of forum. The Court only discusses considerations when the <u>actual</u> plaintiff is foreign to the forum -- which is not the case here. *See, e.g., Piper Aircraft*, 454 U.S. at 256 ("<u>When the plaintiff is foreign</u> [] this assumption is much less reasonable.") (emphasis added). <u>Second</u>, even in *Koster*, a derivative action, the court only affirmed the dismissal on *forum non conveniens* grounds because the "defendant show[ed] so much harassment and plaintiff's response [] discloses so little countervailing benefit to himself. . ." *Koster*, 330 U.S. at 532. This is clearly not the case here. Also, unlike the instant case, in *Koster* there was absolutely no nexus between the underlying act and New York. *See Koster v. (American) Lumbermens Mut. Casualty Co.*, 64 F. Supp. 595, 596 (E.D.N.Y. 1946). There, the nominal defendant, Lumbermens, was incorporated and located in Illinois, where the various accused misappropriations of corporate assets and other allegations also occurred. In those circumstances, it was clear that plaintiff's choice of forum was to harass the defendants and for purely vexatious purposes.

The Second Circuit has recognized that it is not only the plaintiff's apparent motivation that is part of the *forum non conveniens* analysis, but defendants' as well. *Iragorri*, 274 F.3d at 75 ("just as plaintiffs sometimes choose a forum for forum-shopping reasons, defendants also may move for dismissal under the doctrine of *forum non conveniens* not because of genuine concern with

convenience but because of similar forum-shopping reasons.") This is precisely such a case. Defendants suggest that New York is an inconvenient forum. However, in the defendants' motion to dismiss filed in Alaska, defendants point to New York in an effort to have the Alaska action dismissed as well on *forum non conveniens* grounds. Specifically, defendants point to the fact that plaintiffs in Alaska did not join in the two New York derivative actions even after "the presiding judge in New York explicitly invited them to..." *See* Tullman Decl. Ex. D (attaching Defendants' Memorandum in Support of Motion to Dismiss in Alaska) at 36. It is quite obvious that in this case it is the defendants who are forum-shopping. Defendants cannot have their cake and eat it too.

The deference accorded plaintiffs' choice of forum is but one factor to be weighed by the court in determining whether to dismiss for *forum non conveniens*. Ultimately, however, the defendants must "establish such oppressiveness and vexation . . . as to be out of all proportion to plaintiff's convenience." *Wiwa*, 226 F.3d at 102 (internal citations omitted). No such showing has been made by the defendants in the instant case.

### 2.    The Gilbert Private Interest Factors Support Plaintiffs' Choice of Forum

"[T]he greater the degree to which the plaintiff has chosen a forum where the defendant's witnesses and evidence are to be found, the harder it should be for the defendant to demonstrate inconvenience." *Iragorri*, 274 F.3d at 75.

The private interest factors are analyzed as a balancing test - weighing the convenience of the litigants in this forum. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, (1947)*; See Iragorri* 274 F.3d at 74 ("the court is necessarily engaged in a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country.") Specifically, the factors include ease of access to sources of proof, cost of obtaining attendance of witnesses, possibility of viewing the premises or scene of an accident, access to evidence relating to damages and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508. All these considerations support plaintiffs' choice of forum as being the most convenient.

29

In order for plaintiffs to prove their allegations against the defendants, they must first prove all the underlying claims and allegations as they pertain to each individual incident because these are facts and details of how -- and why -- defendants breached their fiduciary duties. That is, the key relevant issues to plaintiffs' case are whether (i) the Prudhoe pipeline was in fact in a state of severe disrepair and corrosion, (ii) the Texas City Refinery was operated in a grossly unsafe manner as a result of, among other things, budget cuts and that it was those budget cuts that caused the horrific explosion, and (iii) BP manipulated the commodities markets, including NYMEX in New York in violation of federal and state laws and regulations. The witnesses and evidence necessary to prove these claims are located in New York and the United States and are not in England.

In addition, the sites of all these incidents, which may have to be visited, are New York and other U.S. states - not England. If anything, as the defendants themselves have made clear, New York is more convenient for the England-based defendants to reach than either Alaska or Texas, because of the frequency of their trips to New York, the frequency of flights to New York, and the significantly shorter travel time. *See, e.g., Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 479 (S.D.N.Y. 2006) (Noting the number and availability of nonstop flights between London and New York versus London and Houston as a factor in convenience.); *see also, Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000) (in a *forum non conveniens* case involving a foreign court, the "home forum" of an American citizen is any United States court.). Contrary to defendants' arguments, there would be a tremendous cost and difficulty in transporting witnesses and evidence from the various locales, including New York, Alaska, Texas and Chicago, to England, as well as being quite "vexatious" for the plaintiffs. Neither plaintiffs nor their counsel have private jets at their disposal. Neither do they regularly conduct business in England. In contrast, any pertinent documents located in England can easily be transported to New York. *See DiRienzo*, 294 F.3d at 30 *citing, Itoba Ltd. v. LEP Group PLC*, 930 F. Supp. 36, 44 (D. Conn. 1996) ("To the extent documents exist in England, advances in transportation and communication accord this issue less weight."); *Gilstrap*, 443 F. Supp. 2d at 488 ("[I]n the era of electronic discovery [access to

30

documentary evidence] carries less weight . . ."). In addition, the cost of transporting the relatively few witnesses from England to New York that will be required is much smaller than the possible cost of transporting witnesses from New York, Alaska, Texas, and Chicago to England.

Defendants argue that "most, if not all, of the documents and witnesses in this case are located in England." Def. Mem. at 27. This is wholly misleading and not factually supported. In the first instance, outside of the books and records of BP -- which are only a small fraction of the relevant discovery in this litigation -- defendants have not supplied the Court with any record supporting this assertion. Indeed, BP has produced millions of pages of documents to litigants, regulators and investigators in the United States in connection with the issues which are they subject of this litigation. Did they tell them that any litigation or investigation could only be conducted in English courts or examined by British authorities? The question is, of course, rhetorical and answered by the defendants' retention of the Baker Panel in the United States to conduct an investigation and write a report. All of the members of the Panel are Americans. Surely, there are professionals in England and Wales who are qualified to do those tasks. The defendants did not ask them to do so because the issues, witnesses and documents are located in the United States.

Second, defendants in essence are urging this Court to take an extremely narrow view of the issues involved in this litigation. They believe that only the actual knowledge of the officers and directors of BP, and only documents at the board level, are at issue in this litigation. However, as stated above, all the underlying allegations must first be established before plaintiffs can prove the willful, reckless and negligent breaches by BP's board and management. Therefore, in reality, most, although not all, of the documents and witnesses in this case are located in New York and the United States. *See, e.g., Strategic Value Master Fund Ltd.*, 421 F. Supp. 2d at 763-64. In addition, the U.S. already is the forum for the numerous civil and criminal proceedings, as well as governmental actions and investigations against BP and the defendants. It is clear that the facts that drive this lawsuit are the Prudhoe Bay leak, Texas City explosion and various market manipulations. They are the how and why of defendants' multiple, egregious breaches of fiduciary duty. Specifically, all the

31

witnesses to the operation of the Alaska pipeline, the survivors and witnesses to the Texas City explosion, plant managers, expert witnesses relating to damages in the U.S., governmental witnesses such as Carolyn Merrit of the CSB, members of the Baker Panel, SEC and CFTC representatives are located in the United States.

Similarly, although the directors would be necessary witnesses in this case, they are but a mere fraction of the necessary witnesses.[24]  Despite that, only about16 defendants actually live in England, Def. Mem. at 4, while 11 are citizens and/or reside in the United States. *Supra*. 17.  In no way have the defendants demonstrated that the cost of flying the few directors from England to New York, given BP's access to a fleet of private jets or commercial aircraft and sending over relevant documents are "excessively burdensome, especially in the view of the defendants' vast resources, . . .and [] the additional cost and inconvenience to the defendants of litigating in New York is fully counterbalanced by the cost and inconvenience to the plaintiffs of requiring them to reinstitute the litigation in England . . . ." *Wiwa*, 226 F.3d at 107 (internal citations omitted), such that the plaintiffs' choice of forum should be disturbed.

Defendants themselves have shown, that they are amenable to utilizing this jurisdiction, and the United States in general.  In truth, all the litigation regarding Texas City, Alaska and the various Commodities investigations, including the investigation by the Baker Panel appointed by BP, took place in the United States.  Indeed, in multiple press releases the Company announced that it is "cooperating fully in all investigations."  Obviously, in those situations, the defendants did not seek dismissal of the investigations on the grounds of convenience.  They have made themselves available to United States federal and state regulators and investigators.  In all the various civil litigations and investigations the Company is undergoing, the defendants never suggested that England would be

---

[24]     The Baker Panel Report, in setting out the scope and methodology of the Panel's investigation of the Texas City catastrophe, noted that the Panel interviewed more than 700 individuals in the United States.  The CSB Investigation Report on the refinery explosion notes that 370 interviews were conducted.  U.S. Chemical Safety and Hazard Investigation Board, Investigation Report, *Refinery Explosion and Fire*, No. 2005-04, § 4.1 (March 2007) attached to Tullman Decl. as Ex. E.

a more convenient forum. Now, when the defendants are finally facing the possibility of being held personally accountable, they for the first time contend that England is the "more convenient" forum. However, there is nothing in the UK that makes it so.[25]

In comparing the hardships defendants would face trying this case in this forum, versus the hardship plaintiffs would face being forced to litigate in England, especially in light of the expense plaintiffs have already incurred in this litigation, it is clear that plaintiffs' choice of forum is neither vexatious for the defendant nor is it for forum shopping reasons. Rather, New York is an adequate and convenient forum to pursue this litigation.

**3.    The Gilbert Public Interest Factors Also Support Plaintiffs' Choice of Forum**

In the last step of the forum non conveniens analysis, the Supreme Court has enumerated four relevant factors in analyzing the public's interest in a dispute. They are: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the local interest in having localized controversies decided at home; and (4) avoiding difficult problems in conflict of laws and the application of foreign law. *DiRienzo*, 294 F.3d at 31 (internal quotations omitted) (*citing Gilbert*, 330 U.S. at 508-09). All these factors also support the litigation of this case in this forum.[26]

---

[25]    Any decision by this Court finding it has personal jurisdiction over the defendants would most likely be respected by, and therefore be enforceable by, courts in the United Kingdom. Irrespective of defendants' argument, they fail to show any reason whatsoever why an English court would not respect the decision by this Court to assert personal jurisdiction over the defendants. To the contrary, plaintiffs have alleged numerous facts, including, among other things, defendants' agreement to have all rights stemming from the purchase of ADSs governed under the laws of New York. In addition, admittedly, many of the defendants live and/or reside in the United States. Therefore, any judgment against them would most definitely be enforceable. Defendants' own authority is less than persuasive on this matter, while based on the facts identified in the Complaint, plaintiffs believe that there is no possibility that an English court would not respect any judgment by this Court.

[26]    The administrative difficulties factor does not weigh in either New York's or England's favor. *See, e.g., Strategic Value Master Fund*, 421 F. Supp. 2d at 774 (there is no basis to assume how congested or not, the relevant English courts are). Also, the fairness of imposing jury duty is very closely linked with the interest of having localized controversies decided at home. *See DiRienzo*, 294 F.3d at 31 (where there is a local controversy that community has the right to hear the claims; the court further recognized that "the majority of their securities transactions were conducted

33

In expanding on the public interest in lawsuits, the Supreme Court has explained, "[i]n cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only." *Gilbert*, 330 U.S. at 509. Since, the case at hand predominantly concerns the conduct of BP in the United States, including New York, notwithstanding the fact that BP is a British corporation and some of its directors are British citizens, the local interest factor weighs heavily in favor of litigation in New York.[27]

Contrary to defendants' assertions, this case is not only "about the alleged mismanagement of BP," Def. Mem. at n.13, and it is not that mismanagement that "purportedly forms the basis for plaintiffs' action." *Id.* Rather, as detailed above, *supra* 31, the operative facts in this case that must be proven in order to get to the breach of fiduciary duties by the defendants, are the commodities manipulations on NYMEX in New York as well as other exchanges, the Alaska spill and the Texas City explosion. The Court will have to look to all this U.S. and New York evidence and events in order to assess liability. *Cf. Strategic Value Master Fund*, 421 F. Supp. 2d at 771 (Where plaintiffs urged the court to take a narrow view in its inquiry, the court refused since the court would have to look to English evidence and testimony in addition to the New York testimony which supported England's local connection to the suit).

---

entirely in the United States, by Americans, in American dollars, on American stock exchanges."). Therefore, we will only deal with the local interest and conflicts of law factors, both of which support New York in hearing these claims.

[27] Additionally, as discussed above, federal courts are considered the home forum for all US citizens which further supports the Southern District of New York as the proper forum for all the various US localities involved in this litigation. *See Guidi*, 224 F.3d at 146 (in a *forum non conveniens* case involving a foreign court the "home forum" of an American citizen is any United States court).

Last, defendants argue that since "this action is governed by English law" it supports dismissal. Def. Mem. at 30. However, as discussed above, *supra* 11, plaintiffs have demonstrated that New York law should apply and therefore this Court does not have to construe English law.[28]

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss should be denied in its entirety.

Dated: April 2, 2007
     New York, New York

                                 **WEISS & LURIE**

                                 /s/ Joseph H. Weiss
                                 Joseph H. Weiss (JW-4534)
                                 James E. Tullman (JT-9597)
                                 Jack I. Zwick (JZ-2514)
                                 Julia Sun (JS-4982)
                                 Joshua M. Rubin (JR-5168)
                                 551 Fifth Avenue
                                 New York, New York   10176
                                 (212) 682-3025

                                 **STULL STULL & BRODY**
                                 Jules Brody (JB-9151)
                                 Howard Longman (HL-2489)
                                 Patrick Slyne (PS-1765)
                                 Aaron Brody (AB-5850)
                                 6 East 45th Street
                                 New York, New York   10017
                                 (212) 687-7230

                                 Co-Lead Counsel for Plaintiffs

---

[28]     Even should the Court find that English law does apply, in the *forum non conveniens* analysis, this is but one factor to be weighed.  This Court is quite capable of construing English law as many courts have done.  It also has the benefit of plaintiffs' and defendants' experts.